762 P.2d 631

**Robert V. KERLEY, a married man dealing with his sole and separate property; Timberline Development Company, an Arizona corporation, on its own behalf and as a successor in interest to Quality Hill Construction Company, a joint venture, Plaintiffs–Appellants,**

v.

**NU–WEST, INC., a foreign corporation and L.C. Jacobson & Company, Defendants, Cross Claimant–Appellees.**

**No. 1 CA–CIV 9349.**

Court of Appeals of Arizona, Division 1, Department A.

Sept. 22, 1988.

Mariscal, Weeks, McIntyre & Friedlander, P.A. by Richard A. Friedlander, Michael S. Rubin, Scott A. Holcomb, Phoenix, for plaintiffs-appellants.

Brown & Bain, P.A. by C. Randall Bain, C. Timothy Delaney, Joseph E. Mais, Phoenix, for L.C. Jacobson & Co.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by Redfield T. Baum, Phoenix, for Nu–West, Inc.

## OPINION

KLEINSCHMIDT, Judge.

This case presents questions of whether an agreement to sell land and a consulting agreement are invalid because they constitute an unreasonable restraint on alienation or because they violate the rule against perpetuities. We hold that the agreements are valid.

## THE AGREEMENTS

L.C. Jacobson and Resorco, Inc. had an interest in a subdivision known as Pinetop Lakes. In 1980, acting through a trustee, they sold fifteen acres of land in the subdivision to Robert Kerley. They retained their interest in adjoining land.

The transaction was set forth in two separate but interrelated agreements. One

was an Agreement of Sale and the other was an Architectural Planning and Consulting Agreement. The purpose of the Agreement of Sale was described in the following clause:

The purchase and sale of approximately 15 acres of real property located within the subdivision known as Pinetop Lakes, Pinetop, Arizona, together with assurances for its development and resale.

The Agreement of Sale specified a total price of $390,000, or $26,000 per acre. Kerley was to pay $40,000 upon execution of the agreement and the balance in increments as portions of the property were selected and received by him.

The Agreement of Sale contained a recitation that part of the consideration for the sale was that Kerley would develop, improve, and resell the fifteen acres, thus benefiting the surrounding land in which Jacobson and Resorco had a substantial interest. The Agreement of Sale also contemplated that Kerley would be required to enter into certain agreements to assure the orderly development of the 15 acres in a manner compatible with the surrounding property. It was a specific condition precedent that prior to the closing of any purchase of a portion of the fifteen acres, Kerley would execute an Architectural Planning and Consulting Agreement with Resorco, authorizing Jacobson, the consultant retained by Resorco, to approve the site plan and design of any structures to be built.

Kerley and Resorco did duly execute an Architectural Planning and Consulting Agreement. This agreement recited that Kerley had agreed to buy the fifteen acres and stated that its purpose was to assure the orderly development and resale of the property in a prompt and businesslike manner. Under its terms, Kerley was to submit plans for each "phase" of the development for Resorco's approval. "Phase" was defined as "an individual parcel of at least three acres." Resorco was also required to furnish Kerley with development plans and with advice on implementing them. The agreement called for Kerley to pay Resorco ten percent of the gross sales price from the first sale of each improved portion of the property. This obligation to pay the percentage fee was to constitute a covenant running with the land and was to be binding on successive owners until the amount due on the first sale was paid. It was also agreed that in 1988 and 1989, Resorco could repurchase any of the land that had not been developed or resold.

Some time after the agreements were executed, Kerley sued Jacobson, Resorco, and Nu–West, Inc., the successor to Resorco's interest in the consulting agreement. Kerley sought rescission on the grounds, among others, that the Architectural Planning and Consulting Agreement was void because it constituted an unreasonable restraint on the alienation of property and because it violated the rule against perpetuities. The trial court disagreed and granted summary judgment against Kerley on these issues. This appeal followed. Unless reference to a specific party is necessary in context, we will refer to all parties whose interests are the same as Kerley's as "Kerley." We will refer to all parties whose interests are opposed to Kerley's as "Jacobson."[1]

## RESTRAINT ON ALIENATION

There are three subarguments to Kerley's claim that the architectural agreement is an unreasonable restraint on the alienation of property. The first of these is that the fee of ten percent on resale of the various portions of the property is an invalid "quarter sale." Kerley says that law from other jurisdictions which condemns such arrangements should apply in Arizona. He also argues that even if the agree-

1. We have simplified our description of the parties' interests and of their relative positions in this action. In addition to assuming Resorco's position on the consulting agreement, Nu–West had itself purchased land from Jacobson, Resorco and others subject to a similar consulting agreement. Nu–West brought a cross-claim against Jacobson and Resorco asserting that if its position, vis-a-vis Kerley, was held to be invalid, then the consulting agreement it entered into as a part of its land purchase would also be void. Finally, Resorco became L.C. Jacobson & Co.

ment is not a quarter sale, it is an unreasonable restraint on alienation under the test adopted by the *Restatement of Property* § 406 (1944). Finally, he insists that, at the very least, it was improper to grant summary judgment because material issues of fact remain in dispute. We discuss each of the arguments in turn.

■ A "quarter sale" is the transfer of a fee simple interest in land without the retention of a reversionary interest but with the requirement that the buyer pay a portion—usually one-quarter—of any subsequent sale price to the original seller. 6 *American Law of Property* § 26.68 at 512 (1952). An early case condemning such transfers observed that ownership of the fee cannot exist in one person while ownership of the right of alienation, and of its fruits, exists in another. The arrangement was said to be in the nature of a fine upon alienation, which was inconsistent with fee simple ownership. *DePeyster v. Michael*, 6 N.Y. 467 (1852). Kerley cites three more recent cases which hold that "quarter sales" are invalid as a matter of law. *United States v. 397.51 Acres of Land*, 692 F.2d 688 (10th Cir.1982); *White v. White*, 105 N.J.Super. 184, 251 A.2d 470 (1969); and *Dunlop v. Dunlop's Executor*, 144 Va. 297, 132 S.E. 351 (1926). He also cites one very recent case which, without referring to the transactions as "quarter sales," holds that they are impermissible for the reason that they discourage sales "because the owner does not receive full value for the property." *Girard v. Myers*, 39 Wash. App. 577, 584, 694 P.2d 678, 683 (1985).

■ While the transaction that Kerley challenges might be defined as a "quarter sale," labeling it as such and then concluding that it is invalid per se is not a proper way to answer the question. Restraints on alienation are permissible under Arizona law if they are "reasonably designed to attain or encourage accepted social or economic ends." *Hanigan v. Wheeler*, 19 Ariz.App. 49, 52, 504 P.2d 972, 975 (1972).

The *Restatement of Property* § 406 (1944) discusses the conditions under which a restraint on alienation may be valid. In short, it specifies that a restraint is permissible if it is reasonable under the circumstances. Comment i to that section reads as follows:

i. *Reasonableness.* Even though a restraint on alienation is a forfeiture or promissory restraint and is qualified so as to permit alienation to some though not all possible alienees, the restraint must still be found to be reasonable under all the circumstances. The following factors, when found to be present, tend to support the conclusion that the restraint is reasonable:

1. the one imposing the restraint has some interest in land which he is seeking to protect by the enforcement of the restraint;

2. the restraint is limited in duration;

3. the enforcement of the restraint accomplishes a worthwhile purpose;

4. the type of conveyances prohibited are ones not likely to be employed to any substantial degree by the one restrained;

5. the number of persons to whom alienation is prohibited is small;

6. the one upon whom the restraint is imposed is a charity.

The following factors, when found to be present, tend to support the conclusion that the restraint is unreasonable:

1. the restraint is capricious;

2. the restraint is imposed for spite or malice;

3. the one imposing the restraint has no interest in land that is benefited by the enforcement of the restraint;

4. the restraint is unlimited in duration;

5. the number of persons to whom alienation is prohibited is large.

We now consider how these factors apply to this case.

Jacobson argues that instead of restraining alienation, the agreement actually encourages Kerley to develop and resell the land. The agreement's real purpose and effect, Jacobson says, was to allow Kerley to defer payment of the full purchase price of the land. He characterizes the arrangement as a type of "creative financing" that

allowed Kerley to take possession of and to develop the land free of liens. Jacobson points out that the variance created by tying the amount he ultimately receives to the amount Kerley is able to realize from the sale of the land is simply a way of adjusting the price according to the success of the development.

Kerley, on the other hand, insists the agreement's only purpose is to allow Jacobson to share in the profits of his development. Kerley supported his objection to the motion for summary judgment with an affidavit to the effect that the consulting agreement was never represented by Jacobson as being part of the purchase price and that Jacobson expressly represented that the fee would be earned by services provided in marketing the property. He points to the fact that both the Agreement for Sale and the Architectural Planning and Consulting Agreement contain language that each is the entire contract between the parties.

Three of the factors listed in Comment i to § 406 of the *Restatement* bear on this case. It is indisputable that Jacobson has or had an interest in land which he sought to protect and enhance by the arrangement the parties entered into. The focus of the problem resolves into whether the agreement has a worthwhile purpose and whether the obligation it creates is of unlimited duration.

■ In our opinion the trial judge was correct when he found that "the agreements on their face are reasonably designed to attain or encourage accepted social or economic ends, and Nu–West [Kerley] *has been unable to demonstrate otherwise.*" (Emphasis added.) The simple, indisputable fact is that the whole purpose of the agreement was to develop and sell land—the very antithesis of the purpose of those practices that gave rise to statutes and decisions forbidding quarter sales and unreasonable restraints on alienation.

Kerley's affidavit stating that the ten percent payment was for services and was not a part of the cost of the land is an exercise in labeling. Economic reality controls. Kerley knew when he bargained for the agreements that he must project his profit or loss on the basis of a cost of $26,000 an acre plus ten percent of what developed parcels would sell for on the market. It really does not matter whether the ten percent is to be paid for land, for consulting services, or for both. Nor does it matter that the agreement allows Jacobson to share in the profits of Kerley's venture. The parties bargained for this.

We do not accept the argument that the ten percent payment requirement will restrain alienation. Kerley's whole purpose was to develop and sell the land, and under the agreements he has no choice but to do so. While he would no doubt prefer to keep the ten percent for himself, he has every reason to sell even though he has to pay the ten percent unless he must sell at a loss. Selling at a loss is a possibility that confronts every developer who enters into a venture and who must estimate ahead of time what his cost and resale price will be.

■ We turn to the question of whether the agreement is reasonable in duration. As written, the obligation to pay money is unlimited as to time. The law, however, implies that it will be carried out within a reasonable time. In *Byke Construction Co. v. Miller*, 140 Ariz. 57, 680 P.2d 193 (App.1984), the parties entered into a sale of land which required the buyer to begin the construction of a house on the property by a certain date. If the buyer did not begin construction on time, the seller had the right to repurchase the property. No time limit was set on the exercise of this right, and the buyer attacked the repurchase proviso as violative of the rule against perpetuities. We held that the agreement did not violate the rule because there was a condition of the agreement, implied by law, that the repurchase would be exercised within a reasonable time. We observed that if the seller had sought specific performance of the option in the distant future, he would not have been entitled to it.

Kerley argues that *Byke* does not apply to this case because the agreement to pay ten percent of the repurchase price is a covenant running with the land that is

binding forever. He concludes from this that the parties' explicit intent was that the obligation to pay not be limited to a reasonable period and that *Byke* therefore has no application. Alternatively, he argues that, since the agreement gives the seller the right to repurchase undeveloped property eight years after the execution of the agreement (during 1988–1989), the condition calling for the ten percent payment is invalid after that time. Again, we do not agree.

This case does differ from *Byke* in one respect. Here, the power to cause the event that will trigger the obligation to pay the ten percent payment is within the buyer's control. In *Byke,* it was the seller who had the power, by exercising the option, to decide when the interest would vest. Here, the seller has no direct means of causing the development and resale of the land. *Byke* is nonetheless instructive for its observation that reasonable limitations implied by law will save a transaction that might otherwise be invalid. *Id.* at 59, 680 P.2d at 195.

■ Everything about these agreements bespeaks the intention of the parties to achieve development and resale of the land with reasonable expedition. While Jacobson has no direct means of making the ten percent charge vest, he is not without a remedy. At some point in time, not necessarily limited to the period within which Jacobson has the right to repurchase any unsold property, the purpose of this agreement might be said to have been defeated if the property has not been developed and sold. If Jacobson takes no legal action to see that the spirit of the agreement is enforced when that point comes, laches may foreclose his right to receive the ten percent payment when the land is resold. We cannot say on this record just when such a bar might occur. The question of whether Kerley has made a good-faith effort to comply with the agreement and the concomitant question of whether Jacobson has slept on his right to compel compliance may depend on many factors, the first to come to mind being those that effect the market for the land.

Kerley insists that there are disputed questions of material fact as to whether the ten percent payment was part of the price of the land, whether it was reasonable, and whether it served a worthwhile purpose. We disagree. The effect of the agreement is clear and indisputable. As we have already observed, the label applied to the payment is unimportant, and the law assumes that encouraging the development and resale of real estate is worthwhile.

Kerley relies on *Girard v. Myers,* 39 Wash.App. 577, 694 P.2d 678 (1985). That case construed an agreement that allowed the seller the right of first refusal on a resale of the property and the right to receive a percentage of the resale price of the land. The agreement was unlimited in duration, the seller had no interest in protecting the land sold or any other land, and no specific development of the property was envisioned. The court concluded that the arrangement was void because "it discourages a sale because the owner does not receive full value for the property." *Id.* at 584–87, 694 P.2d at 683–84. For the reasons discussed above, we reject this premise as applied to the agreements we construe. We also believe that *Girard* is distinguishable because the factors bearing on the question of reasonableness in that case were so different from those presented here. While it is not possible to say that every arrangement for the payment of a percentage of the price on resale is reasonable as a matter of law, this is one case in which we can say that it is.

## THE RULE AGAINST PERPETUITIES

The trial court found that the Architectural Planning and Consulting Agreement, in giving Jacobson the right to receive a percentage of the price from a future sale of the land, created a covenant running with the land. However, since the agreement ceded Jacobson no interest in the land, the trial judge held that it did not violate the rule against perpetuities. In his insistence that this was incorrect, Kerley relies on A.R.S. § 33–261, which provides:

The common law rule known as the rule against perpetuities shall hereafter be

applicable to all property of every kind and nature and estates and other interests therein, whether personal, real or mixed, legal or equitable by way of trust or otherwise.

We are puzzled by Jacobson's failure to answer Kerley's assertion that this statute governs. In any event, for reasons we discuss below, we do not believe the statute resolves the problem.

 The rule against perpetuities provides:

No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest.

Gray, *Rule Against Perpetuities* § 201 at 191 (4th ed. 1942).

Kerley argues that the Architectural Planning and Consulting Agreement sets no time within which the property must be developed or sold and no time for the payment of the ten percent of the resale price. It follows, he says, that the agreement violates the rule. Jacobson argues that the rule does not apply because it merely creates a right to receive money in the future. This, we believe, is the key to the problem.

The leading authority on the application of the rule says:

The rule against perpetuities concerns rights of property only, and does not affect the making of contracts which do not create rights of property. Thus, a promise to A to pay him or his executors or administrators a sum of money on a future event is good, although such event may not happen within twenty-one years after lives in being; and this is not altered by the fact that the covenant runs with the land (as, for instance, a covenant of warranty), or can in any way, be enforced by or against other persons than the original parties and their representatives. . . .

Gray, *The Rule Against Perpetuities* § 329 at 360–61 (4th ed. 1942). *See also* Simes and Smith, *The Law of Future Interests* §§ 1244–46 (2d ed. 1956); *Restatement of Property* §§ 101, 393 comment j

(1944); and Leach, *Perpetuities in a Nutshell*, 51 Harv.L.Rev. 638, 660 (1938).

 Our statute, A.R.S. § 33–261, which makes the rule against perpetuities applicable to personal property, does not affect this result. The authorities which recognize that the rule applies to personal property nonetheless exempt contracts for the payment of money from its operation. *See* Gray §§ 202, 319, 329; Simes and Smith §§ 360, 1244–46.

 There is yet another reason why the rule against perpetuities does not apply. When Jacobson reserved the right to receive a percentage of the resale price, he did so for his own direct benefit and did not create a right in a third person. The reservation of such a right in oneself does not fall within the rule against perpetuities. *Restatement of Property* §§ 25, 370, 372, *see also* comments (e) and (h) to § 370.

The judgment of the trial court is affirmed.

JACOBSON, P.J., and GREER, J., concur.