22 F.3d 199
 In re E. Jerome TAMEN; Nelly Danielle Tamen, Debtors.
E. Jerome TAMEN; Nelly Danielle Tamen, Plaintiffs-Appellees,
v.
ALHAMBRA WORLD INVESTMENT, INC.; Daniel Chu; Delta
Partnership Pacific, Ltd., Defendants-Appellants.
 No. 92-56171.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 1, 1994.
Decided April 15, 1994.
 
 Arthur Leeds, McKenna & Fitting, Los Angeles, CA, for plaintiffs-appellees.
 Aaron M. Peck, Rogers & Wells, Los Angeles, CA, for defendants-appellants.
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel.
 Before: SNEED, THOMPSON, and Pamela Ann RYMER, Circuit Judges.
 Opinion by Judge SNEED.
 OPINION
 SNEED, Circuit Judge:
 
 
 1
 This case stems from agreements for the sale and subsequent development of real property. The seller claims that the buyer breached the agreements by reselling the property prior to development. The bankruptcy court found the buyer, and several related defendants, liable under various contract and tort theories. The Bankruptcy Appellate Panel (BAP) affirmed. We also affirm.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 Plaintiff E. Jerome Tamen was the general partner in two California limited partnerships, University Estates, Ltd., and Yucaipa Estates, Ltd. Each limited partnership owned property in the Yucaipa Valley in San Bernardino County, California. In 1985, Tamen and his wife entered Chapter 11 reorganization proceedings.
 
 
 3
 Facing the prospect of foreclosure, Tamen discussed the possible development of the Yucaipa Valley properties with Daniel Chu, president and sole director of Alhambra World Investments, Inc. (Alhambra). On October 22, 1986, Tamen's two partnerships agreed to sell the properties to Alhambra for the amounts in default on the properties' debts. Alhambra agreed not to assign its interest in the sale agreements except under certain conditions.
 
 
 4
 Concurrently, Alhambra and Tamen entered into two management agreements, under which Tamen would manage the development of the properties while Alhambra would arrange financing. Although Alhambra was free to discharge Tamen "at any time," Tamen would receive one-half the profits from development and sale, even if he was discharged. The bankruptcy court with jurisdiction over the Tamen reorganization approved the sale and management agreements.
 
 
 5
 Tamen then began obtaining the necessary plans, studies, and permits for developing the subject properties. The project apparently was nearing the groundbreaking stage in July 1987. At that time, however, Tamen gradually ceased his duties as development manager because Chu refused to reimburse him for certain expenses. On November 17, 1987, Alhambra, controlled by Chu, agreed that either partner, Chu or Tamen, would have the right of first refusal to buy the other's position or to buy into a joint venture with a new investor.
 
 
 6
 In addition to being Alhambra's president, Chu also was the owner, president, and sole director of Delta Partnership Pacific, Ltd. (Delta). The lineup was now Chu, Alhambra, and Delta on one side and Tamen on the other. On February 25, 1988, after lengthy negotiations, Delta and CSCEC-US, a truly unrelated corporation, formed a joint venture to develop the Yucaipa Valley properties. Tamen was not a party. CSCEC-US agreed to purchase the properties from Alhambra for $1 million in what we will call "Transaction No. 1." After holding the properties for a brief "custodial period," CSCEC-US was to transfer them to the newly formed venture in what we will call "Transaction No. 2."
 
 
 7
 Chu informed Tamen of the sale to CSCEC-US on March 17, 1988, and gave Tamen twenty-four hours to exercise his right of first refusal made available to him by reason of the November 1987 modification to the Alhambra purchase agreement. Chu did not inform Tamen of the Delta-CSCEC-US joint venture. The first escrow on the CSCEC-US sale closed on March 25, 1988. Alhambra did not provide Tamen with any of the sale proceeds. Tamen, thus, had neither property nor money.
 
 
 8
 Tamen, not surprisingly, brought an action in bankruptcy court against Chu, Alhambra, Delta, CSCEC-US, and the Delta-CSCEC-US joint venture, alleging fraud, tortious interference with economic advantage, and various breaches of contractual and fiduciary duties. The bankruptcy court held that CSCEC-US was not liable under any theory but found the remaining defendants jointly and severally liable for: (1) breach of the sale and management agreements, (2) breach of the implied covenant of good faith and fair dealing, (3) breach of the agreement to provide right of first refusal, (4) tortious interference with the Tamen-Alhambra contracts, (5) fraud, and (6) breach of fiduciary duties. The court assessed damages consisting of Tamen's share of the profits from the purchase by CSCEC-US plus his share of lost profits from Alhambra's failure to develop the properties before sale.
 
 
 9
 The BAP affirmed the bankruptcy court's judgment against Chu, Alhambra, and Delta. All three appeal.
 
 II.
 JURISDICTION AND STANDARD OF REVIEW
 
 10
 This court has jurisdiction over decisions of the BAP under 28 U.S.C. Sec. 158(d). We apply the same standard of review as the BAP did; namely, we review the bankruptcy court's factual findings for clear error while reviewing its legal conclusions de novo. In re Carroll, 903 F.2d 1266, 1269 (9th Cir.1990).
 
 III.
 DISCUSSION
 
 11
 The issues on appeal fall under three general headings: (A) whether, in a proper legal sense, Tamen was "wronged," (B) whether, if wronged, the damage award was excessive, and (C) which defendants are liable for such damages as are appropriate.
 
 
 12
 A. Was Tamen Wronged?
 
 
 13
 Although the bankruptcy court and BAP found several defendants liable under multiple theories, this case essentially derives from two allegedly wrongful acts: Alhambra's failure to give Tamen his share of the CSCEC-US sale profits (Transaction No. 1), and its sale of the subject properties prior to development, resulting in lost profits for Tamen (Transaction No. 2). Defendants concede their liability on Transaction No. 1. The key to Transaction No. 2 is whether the Alhambra agreements permitted Alhambra to sell the properties before development without Tamen's consent. If so, that sale was not "wrongful" under any theory.
 
 
 14
 1. The Contractual Limitation on Pre-Development Resale
 
 
 15
 The bankruptcy court found, based on extrinsic evidence of the Alhambra-Tamen contract negotiations, that the sale and management agreements prevented Alhambra from reselling the Yucaipa Valley properties prior to development. The court then found that Alhambra breached the agreements by reselling before development. Defendants challenge the court's decision to admit Tamen's extrinsic evidence as well as its ultimate conclusion as to the meaning of the sale and management agreements.
 
 
 16
 Where the interpretation of a contract involves review of extrinsic evidence, this court reviews findings of fact for clear error while reviewing de novo the principles of law applied to those facts. Stephens v. City of Vista, 994 F.2d 650, 655 (9th Cir.1993). Under California law, extrinsic evidence is admissible if relevant to prove a meaning to which the contractual language is reasonably susceptible. Id. at 656. Even if a contract appears unambiguous on its face, a court must engage in a preliminary consideration of extrinsic facts in order to determine whether those facts create an ambiguity. Id. at 656-57.
 
 
 17
 Defendants first contend that the bankruptcy court should not have considered Tamen's extrinsic evidence because it did not first determine whether the agreements were reasonably susceptible to Tamen's interpretation. This contention lacks merit. The bankruptcy court agreed with Tamen's interpretation, thus implicitly finding that the agreements were reasonably susceptible to that interpretation.
 
 
 18
 The bankruptcy court's construction of the agreements was not clearly erroneous. Plainly, the parties agreed to jointly develop the properties. The sale prices were nominal. Both sale agreements were subject to the terms of the management agreements; indeed, this was a crucial factor in securing the bankruptcy court's approval. The management agreements appointed Tamen as manager for the care and development of the properties, laying out each party's respective role in detail. At trial, Chu himself admitted that he and Tamen agreed to develop the properties.
 
 
 19
 The contractual restrictions on resale, while less explicit, support Tamen's view. The management agreements do not expressly mention such a restriction, and also state that they contain the entire agreement between the parties. The sale agreements, however, state that Alhambra could not assign its interest in those agreements without Tamen's written consent, except to an entity in which Alhambra had at least a fifty percent interest, and only if the assignee assumed all of Alhambra's obligations.
 
 
 20
 Defendants assert that this no-assignment clause refers only to Alhambra's obligations under the sale agreements, namely to pay the purchase price and take delivery. This ignores the fact that the sale agreements specifically incorporate the management agreements, which provide for joint development. At trial, Tamen explained that he and his wife told Chu they would not enter into any agreement unless they could participate in the profits from development of the properties, and that Chu assured them that the properties "would be developed with single family residences prior to sale." After receiving lengthy declarations and testimony from both parties, the bankruptcy court agreed with Tamen. Its findings are not clearly erroneous.
 
 
 21
 Defendants offer three extrinsic facts to contest that interpretation. First, they argue that Tamen actively sought resale before development and thus could not have believed the contract precluded resale. To support this first assertion, however, they point only to the fact that Tamen met with a broker without obtaining a commitment or offer and to the fact that Tamen explored the possibility of resale after his relationship with Chu soured. Neither suggests that Tamen would have allowed pre-development resale without his prior consent. It is entirely proper for the parties to a contract to explore possible alternatives while remaining bound under their original agreement.
 
 
 22
 Second, defendants argue that the right of first refusal granted by Chu is logically inconsistent with a contractual prohibition on resale. To the contrary, Chu agreed only that each partner had a right of first refusal to buy the other's position or to buy into a joint venture with a new investor. The right of first refusal does not explicitly address sale of the underlying properties and in fact reinforces Tamen's claim that he and Chu were co-developers.
 
 
 23
 Finally, defendants observe that Tamen's first complaint merely charged Chu with obtaining an inadequate resale price and that Tamen failed to assert the contractual bar on resale until amending his complaint. Their theory is that Tamen did not really believe the contract precluded pre-development resale. It is unlikely that Tamen's alternative pleadings, which were proper under Rule 8(e)(2) of the Federal Rules of Civil Procedure, could be used as evidence against him. See Oki America, Inc. v. Microtech Int'l, Inc., 872 F.2d 312, 314 (9th Cir.1989). Even if admissible, this evidence does not render the trial court's findings clearly erroneous.
 
 
 24
 Moreover, even if the contracts did not preclude all pre-development resales, at the very least they did not allow the sleight-of-hand that occurred here. The elaborate no-assignment provisions in the sale agreements indicate that so long as Chu maintained control over the properties, Tamen would maintain his interest in profits. By selling to CSCEC-US, which then resold the properties to a joint venture owned fifty percent by Chu, Chu continued his participation in the development and retained his half interest in development profits while replacing Tamen with CSCEC-US. When all was said and done, Chu effectively sold Tamen's interest in the development agreement without Tamen's consent, then tried to pocket the proceeds.[1]
 
 
 25
 2. The Reasonableness of the Contractual Restraint
 
 
 26
 Defendants next argue that, if the Alhambra agreements did limit resale of the properties, such a limitation would constitute an illegal restraint on alienation. Defendants concede that they did not present this argument to the bankruptcy court. However, California law allows a party to raise the issue of a contract's illegality at any time. See Pacific Tel. & Tel. Co. v. MCI Telecommunications Corp., 649 F.2d 1315, 1319 (9th Cir.1981).
 
 
 27
 Under California law, "[c]onditions restraining alienation, when repugnant to the interest created, are void." Cal.Civ.Code Sec. 711 (West 1982). This rule does not bar all alienation restraints, only unreasonable ones. Kendall v. Ernest Pestana, Inc., 40 Cal.3d 488, 709 P.2d 837, 843, 220 Cal.Rptr. 818, 824 (1985) (in bank). The reasonableness of a contractual restraint is determined by balancing its justification against the quantum of restraint imposed. Id. In determining reasonableness, a court should consider "the facts and circumstances surrounding [the] creation and application" of a challenged restraint. Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal.4th 342, 826 P.2d 710, 717, 6 Cal.Rptr.2d 467, 474 (1992) (in bank).
 
 
 28
 Ordinarily, assessing the reasonableness of a restraint on alienation requires the development of a full factual record. See TransWorld Airlines, Inc. v. American Coupon Exch., Inc., 913 F.2d 676, 682-83 (9th Cir.1990). However, defendants' arguments here are implausible enough to warrant summary adjudication. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (observing that party seeking to avoid summary judgment bears heavier burden if the factual context renders its claim economically implausible). Here, the underlying purpose of the challenged contracts was not to restrain alienation but to facilitate it. The provisions restricting resale were intended to protect Tamen's interest in resale profits.[2]
 
 
 29
 Further, the quantum of restraint was limited. The contracts as a whole were designed to ensure development and resale within a reasonable period. If events had proceeded according to the contractual plan, the parties would have jointly developed the properties, resold them, and shared the resulting profits. If Alhambra had been dissatisfied with Tamen's progress or performance as development manager, it was free to discharge him and hire someone else. If immediate resale proved more profitable than development, Tamen's half interest in resale profits would compel him to approve pre-development resale. Moreover, if development were truly unprofitable, the contractual limitation would lose its teeth: Tamen would suffer no damage from early resale and Alhambra would have no liability for breaching the contract.
 
 3. Tamen's Allegedly Unclean Hands
 
 30
 Defendants next argue that the bankruptcy court should have dismissed Tamen's suit because of his allegedly "unclean hands." This contention stems from three acts by Tamen: (1) his failure to provide for payment to his limited partners when he sold partnership properties, (2) his failure to disclose a "secret side deal" to perform architectural services in addition to managing the developments, and (3) his failure to timely record the sale and management agreements.
 
 
 31
 Tamen argues that defendants failed to present these arguments before the bankruptcy court. Ordinarily, this court will not consider arguments that were not properly raised at trial. In re E.R. Fegert, Inc., 887 F.2d 955, 957 (9th Cir.1989). Although there is no "bright-line rule" to determine whether an issue was properly raised, it "must be raised sufficiently for the trial court to rule on it." Id.
 
 
 32
 We agree with Tamen that defendants did not sufficiently raise this issue at trial. Defendants raised the defense of unclean hands in their answer without mentioning any specific acts of misconduct by Tamen. Despite providing copious excerpts of the record below, they fail to specify where they pressed or even explained this defense. Nor did the trial court make any express findings of fact or conclusions of law on the matter.
 
 
 33
 B. Were the Damages Awarded Excessive?
 
 
 34
 Damages for breach of contract are, of course, computed as the profits Tamen would have earned had the contract been performed. The same rule applies to Tamen's tortious interference claim. See Robi v. Five Platters, Inc., 918 F.2d 1439, 1443 (9th Cir.1990) (upholding district court's calculation of lost profits). See generally Restatement (Second) of Torts Sec. 774A cmt. b (1977): "In the case in which a third person is prevented from performing a contract with the plaintiff, the plaintiff may recover for the loss of profits from the contract."
 
 
 35
 In keeping with the above rules, the bankruptcy court awarded damages to Tamen for defendants' premature resale of the properties based on the profits that Tamen would have realized had the properties been developed.[3] In computing lost profits, the court relied on Tamen's testimony as an expert witness.
 
 
 36
 Defendants contend that Tamen should not have been allowed to testify as an expert. This argument lacks merit. Qualification of an expert witness rests within the sound discretion of a trial court. See United States v. Trice, 476 F.2d 89, 91 (9th Cir.), cert. denied, 414 U.S. 843, 94 S.Ct. 103, 38 L.Ed.2d 81 (1973). The Advisory Committee's Notes to Federal Rule of Evidence 702 (Testimony by Experts) specifically cite "landowners testifying to land values" as "within the scope of the rule." Fed.R.Evid. 702 advisory committee's notes. Based on Tamen's status as prior general partner and then co-developer of the properties, the bankruptcy court did not abuse its discretion in admitting his testimony.[4]
 
 
 37
 Defendants also argue that the parties planned to bring in limited partners who would also share in development profits and that Tamen's share should accordingly be reduced. We disagree. As written, the Alhambra agreements allocate fifty percent of development profits to Tamen. Tamen should collect damages based on the contracts he signed, not on contracts he might have signed had defendants not breached. It is too late for defendants to ponder the road not taken.
 
 
 38
 C. Which Defendants Are Liable to Tamen?
 
 
 39
 Alhambra, as a party to the original Tamen agreement, is directly liable for breaching that agreement. The bankruptcy court found Chu and Delta directly liable for tortiously inducing Alhambra's breach. But if Chu and Delta, as alter egos of Alhambra, also breached the original agreement, it follows they did not tortiously induce the breach.
 
 
 40
 We need not address either argument. Together, they form a classic Catch-22. If Chu and his affiliates are not alter egos of Alhambra, they are directly liable for tortious interference. If defendants are alter egos of Alhambra, they are all indirectly liable for its breach. Under either theory, compensatory damages are the same. Any error by the bankruptcy court was harmless.
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 The bankruptcy court also found that Chu never intended to honor the Alhambra agreements and thus fraudulently induced Tamen to enter into those agreements. Because we affirm the court's holding on breach of contract, we need not address its finding of fraud. We also need not consider the contractual right of first refusal as an alternative basis for Tamen's recovery
 
 
 [2]
 The Arizona Court of Appeals has upheld a similar restraint on alienation. See Kerley v. Nu- West, Inc., 158 Ariz. 344, 347-48, 762 P.2d 631, 634-36 (Ct.App.1988)
 
 
 [3]
 The bankruptcy court used the same method to compute damages for Tamen's fraud claim. Defendants contest this facet of the court's award. However, because Tamen's contractual claims already support the damage award, we need not address this contention. His losses in reliance upon the promise equaled the expectancy of the promise
 
 
 [4]
 Defendants note that Tamen had little previous experience in property development and that his only previous venture was unsuccessful. The bankruptcy court was free to consider these allegations in assessing Tamen's credibility, just as it was free to consider the fact that defendants, with superior access to information regarding their development profits, failed to introduce any evidence