**In re John A. SANKEY, Debtor.**

**John A. Sankey, Appellant,**

v.

**ABCO Leasing, Inc., Appellee.**

**No. A03–147 CV (JWS).**

United States District Court, D. Alaska.

Feb. 19, 2004.

---

Robert Crowther, Anchorage, AK, for John A. Sankey.

Deborah Ann Crabbe, Foster Pepper & Shefelman PLLC, Seattle, WA, for ABCO Leasing Inc.

## MEMORANDUM DECISION FROM CHAMBERS

SEDWICK, District Judge.

John A. Sankey ("Sankey") has appealed the order entered by the bankruptcy court on June 3, 2003, granting the motion of ABCO Leasing, Inc. ("ABCO") for adequate protection payments under § 363(e) [1] with respect to two lease agreements between the parties.

The court, having reviewed the briefs and record on appeal, has determined that oral argument would not be helpful in the determination of this case, and the parties

---

1. Unless otherwise specified all references to code sections are to the Bankruptcy Code, Title 11, United States Code.

have not requested oral argument.[2] The matter is submitted for decision on the briefs.

## Background/Jurisdiction

ABCO filed a motion under § 363(e)[3] for an order compelling Sankey to make adequate protection payments. More specifically, ABCO requested that, as required by § 365(d)(10),[4] the bankruptcy court compel Sankey to make all lease payments coming due in accordance with the terms of the lease 60 days after the petition was filed. The motion was supported by the Declaration of Rowan Clark, to which are appended the two leases in question. Sankey opposed the motion. The bankruptcy court rendered its Memorandum Decision Granting Motion for Adequate Protection and entered an Order Granting Motion for Adequate Protection.

Sankey filed a motion for reconsideration of the order, which motion was denied June 16, 2003. Sankey timely filed a notice of appeal on June 27, 2003, and simultaneously filed an election that the appeal be heard by this court.

This court has jurisdiction under 28 U.S.C. § 158(a)(1), (c)(1)(A).

## Issues on Appeal

Sankey has presented two issues on this appeal:

1. Whether the contracts between the parties are true leases or disguised security interests; and

2. Whether ABCO is entitled to receive postpetition lease payments in accordance with the terms of the agreements or is entitled to adequate protection payments determined under the standards applied to the holders of security interests.[5]

## Standard of Review

■■■ Legal conclusions and mixed questions of fact and law are reviewed *de novo* while factual determinations are reviewed for clear error.[6] Statutory interpretation is a question of law subject to *de novo* review;[7] the same standard of review applies to the bankruptcy court's interpretation of state law as to its interpretation of federal law.[8] In general, in-

---

2. AK LBR 8012–1

3. Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362). [§ 363(e)]

4. The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household

purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof. * * * * [§ 365(d)(10)]

5. The court notes that, in reality, there is but a single issue because the outcome of the second issue is controlled by the result in the first.

6. *Beaupied v. Chang (In re Chang)*, 163 F.3d 1138, 1140 (9th Cir.1998).

7. *Tighe v. Celebrity Home Entertainment, Inc. (In re Celebrity Home Entertainment, Inc.)*, 210 F.3d 995, 997 (9th Cir.2000).

8. *Conestoga Services Corp. v. Executive Risk Indemnity, Inc.*, 312 F.3d 976, 981 (9th Cir. 2002).

terpretation of the language of a contract is a question of law, which is reviewed *de novo*, with no deference accorded to the decision of the trial court;[9] however, when the interpretation of a lease is based upon the consideration of extrinsic evidence, the decision is reviewed under the clearly erroneous standard.[10] "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[11]

## Applicable Law

■ The parties agree that the resolution of this appeal, as did the decision of the bankruptcy court, turns on whether the two lease agreements in question are true leases or disguised security interests. Whether a lease constitutes a security interest under the Bankruptcy Code depends on whether it constitutes a security interest under applicable state or local law.[12] The leases in this case provide that they are governed by Washington law. Washington has adopted U.C.C. § 1–201(37) (1987).[13]

■ The parties have not cited, nor has the court found, any Washington Supreme Court decision applying the current version of RCW § 62A.1–201(37). When interpreting state law, this court is bound by the decisions of the state's highest court. In the absence of a decision by the highest state court, this court "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance."[14] In undertaking this task, the court should examine the modern trend in connection with the tests employed in distinguishing true leases from disguised security interests.[15]

## Facts

The basic facts in this case are undisputed. The parties entered into two lease agreements.[16]

1.  June 5, 2000, a noncancelable equipment lease ("Lease1"), which provided in relevant part:

    Equipment Cost: $80,625.00;

    60 monthly payments of $2,050.00; and

    An option to purchase at a residual value of $8,062.50.

2.  February 9, 2001, a noncancelable equipment lease ("Lease2"), which provided in relevant part:

**9.** *Taylor–Edwards Warehouse & Transfer Co. v. Burlington Northern, Inc.*, 715 F.2d 1330, 1333 & n. 3 (9th Cir.1983).

**10.** *Tamen v. Alhambra World Investment, Inc.* (*In re Tamen*), 22 F.3d 199, 203 (9th Cir. 1994).

**11.** *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

**12.** *Powers v. Royce, Inc.* (*In re Powers*), 983 F.2d 88, 90 (7th Cir.1993); *In re Rebel Rents, Inc.*, 291 B.R. 520, 525 (Bankr.C.D.Cal.2003).

**13.** RCW § 62A.1–201(37). For ease and consistency, the court will use the U.C.C. designation § 1–201(37) throughout this opinion.

**14.** *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 473 (9th Cir.2001); *In re Filtercorp, Inc.*, 163 F.3d 570, 578 (9th Cir.1998).

**15.** *See Milgard Tempering, Inc. v. Selas Corp. of America*, 761 F.2d 553, 558 (9th Cir.1985).

**16.** The leases were with Wellness Institute of Alaska, Inc. ("WIA") and personally guaranteed by Sankey. How Sankey came to be substituted as the lessee is not apparent from the record; however, the parties do not dispute that Sankey stands in the shoes of WIA.

Equipment Cost: $101,100.00; [17]

60 monthly payments of $2,568.00; and

An option to purchase at a residual value of $10,110.00.

Each Option, which was contained in a document separate from the lease, contained the following statement:

> Lessee specifically acknowledges that the purchase price contained in this option is the closest approximation which the parties can now make of the reasonable value of the property at the end of the lease term, after consideration of anticipated depreciation, potential obsolescence, the extent to which Lessee intends to use the property during the lease term, and the greater extent to which Lessee might use the property but for this option to purchase.

Sankey made an offer proof, which was accepted by ABCO, of the following:

1. Sankey inquired of a broker in Seattle who informed Sankey he would pay $25,000 ± for the Lease1 equipment, sight unseen.
2. That at present there was no market to test for the Lease2 equipment.
3. Sankey obtained a quote from a shipper that the cost of shipping the equipment (for both Lease1 and Lease2) to Seattle would be between $8,000 and $10,000.

From this, the bankruptcy court determined that, on the evidence presented, Sankey had not met his burden of proof of establishing that the leases were not true leases, i.e., that Sankey bore the burden of establishing by a preponderance of the evidence that the leases were not what they purported to be on their faces.

### Discussion

Section § 1–201(37)[2] contains what is commonly referred to as the "bright-line" test.[18]

> Whether a transaction creates a lease or security interest is determined by the facts of each case. However, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:
>
> (a) The original term of the lease is equal to or greater than the remaining economic life of the goods;
>
> (b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>
> (c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or
>
> (d) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

Under this test, a security interest is conclusively found to exist if the lease is not subject to termination by the

---

**17.** There is no evidence in the record to support the acquisition price of the Lease2 equipment. It appears to be an assumed amount provided by counsel for Sankey; however, this amount has not been challenged by ABCO and is therefore accepted by the court as being a "fact" for the purpose of this appeal.

**18.** As others have noted, why the drafters of § 1–201(37) chose to use unnumbered paragraphs with the same subsection designations [(a), (b), (c), etc.] remains a mystery. The Washington Legislature retained this style in adopting RCW § 62A.1–201(37). For clarity, the court will refer to the unnumbered paragraphs as § 1–201(37)[1], [2], [3], and [4].

lessee and any one of the four enumerated conditions is found to exist.[19] The bankruptcy court found that the lease was not subject to cancellation and that subsections (a), (b), (c), and (d) had not been met; therefore, the leases are not security interests under the "bright-line" test. Sankey does not challenge this holding on appeal.[20] The inquiry does not end there. Once the court finds that the leases are not security interests *per se,* it is necessary to examine all the facts to determine whether the economic realities of a particular transaction create a security interest.[21] As Professors White and Summers have stated:

Failure to meet one of these conditions means only that the document is not conclusively a security agreement; the pinball has safely rolled past four holes each marked security agreement. Evasion of these four holes does not earn one enough points to become a lessee. Finding economic life beyond the lease term and seeing no nominal consideration option, what should a court do? The court must then answer whether the lessor retained a reversionary interest. If there is a meaningful reversionary interest—either an up-side right or a down-side risk—the parties have signed a lease, not a security agreement. If there is no reversionary interest, the parties have signed a security interest, not a lease.[22]

It has also been stated:

The central feature of a true lease is the reservation of an economically meaning-

ful interest to the lessor at the end of the lease term. Ordinarily, this means two things: (1) at the outset of the lease the parties expect the goods to retain some significant residual value at the end of the lease term; and (2) the lessor retains some entrepreneurial stake (either the possibility of gain or the risk of loss) in the value of the goods at the end of the lease term.[23]

The bankruptcy court also found, in applying the "facts of each case" provision, that, inasmuch as the option price was not nominal under the *per se* test, "it would not be rational to find the purchase price was nominal as determined by the facts of [the] case." Thus, the court concluded, the lessor retained a meaningful reversionary interest in the leased equipment. Although he abandoned the argument that the options were for nominal consideration under the *per se* test, Sankey argues before this court, as he did the bankruptcy court, that in determining the existence of a meaningful reversionary interest the court should apply a formula test. According to Sankey, the court should look at (1) the original expenditure of the lessor, (2) lessor's rate of return on the funds expended (ignoring any residual value in the leased goods), and (3) the impact on the lessor's rate of return by the reversionary interest, not to exceed the option price. Sankey suggests that if the value of the reversionary interest does not contribute significantly to the profit of the lessor, it would not be "meaningful." Indeed, Sankey

19. 4 White & Summers, *Uniform Commercial Code,* § 30–3 c.1., at pages 23–24 (5th ed.2002).

20. Although he argued before the bankruptcy court and in his opening brief that subsection (d) had been met in this case, in his reply brief Sankey abandoned the argument that the option price was nominal.

21. *In re QDS Components, Inc.,* 292 B.R. 313, 333 (Bankr.S.D.Ohio 2002).

22. 4 White & Summers, *supra,* § 30–3 d. at page 30.

23. Huddleston, *Old Wine in New Bottles: UCC Article 2A Leases,* 39 Ala.L.Rev. 615, 625 (1988), quoted in 4 White & Summers, *supra,* § 30–3 at page 15.

seems to argue that if, under the terms of the lease, the lessor would gain a profit even if the option were not exercised, *i.e.,* the total of the lease payments excluding the option price exceeded the cost of the leased goods, there could be no meaningful reversionary interest in the lessor.[24] The latter must be rejected by the court as contrary to the express language of § 1–201(37)[3](a),[25] indicating that profitability of the transaction does not change the character of the transaction from a lease to a disguised security interest.

As ABCO notes and Sankey acknowledges, the approach suggested by Sankey is a variation of the approach taken by many courts under the prior version of § 1–201(37). Accepting the approach suggested by Sankey tends to place courts right back where they were before the 1987 amendment to § 1–201(37); utilizing a somewhat subjective percentage criterium. In particular, at what point between 0% and 100% in the continuum of the relationship between the option price and overall profitability does a reversionary interest become meaningful—5%, 10%, 15%, or 20%, or something higher? The suggested test is also antithetical to one of the basic underlying premises of the 1987 amendment to § 1–201(37): elimination of percentage tests.[26]

The authorities relied upon by Sankey, to the limited extent they may support his position, are neither controlling nor persuasive. First, as Sankey candidly acknowledges, most are cases interpreting § 1–201(37) prior to its amendment in 1987. Second, the three cases applying post–1987 § 1–201(37), are readily distinguishable. In the first of the cases, *In re Triplex Marine Maintenance, Inc.,*[27] the critical and deciding issue was that under all the facts and circumstances, the lessee had no sensible alternative at the end of the lease term but to exercise the option, thereby leaving no meaningful reversionary interest for the lessor. In the next case, *In re Super Feeders, Inc.,*[28] the controlling consideration was that the option price was considerably less than the fair market value of the equipment at the time the option was to be exercised (option price 20% of the fair market value). Finally, Sankey points to *In re Wakefield.*[29] But there, the court applied the pre–1987 "laundry list" of factors. The court limited its discussion to § 1–201(37)[2] and ignored the impact of § 1–201(37)[3] on the pre–1987 laundry list. Indeed, the *Wakefield* court did not even mention § 1–201(37)[3].

The test advocated by Sankey would require the court to ignore the clear language of § 1–201(37)[3](e),[30] which ef-

---

**24.** In this case, ABCO realized a net profit of $42,735 ($123,000—$80,635) on Lease1 and $52,980 ($154,080—$101,100) on Lease2 before consideration of option prices.

**25.** A transaction does not create a security interest merely because it provides that:

(a) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

\* \* \* \* \* \*

**26.** 4 White & Summers, *supra,* § 30–3 b.1, at page 20.

**27.** 258 B.R. 659 (Bankr.E.D.Tex.2000).

**28.** 236 B.R. 267 (Bankr.D.Neb.1999).

**29.** 217 B.R. 967 (Bankr.M.D.Ga.1998).

**30.** A transaction does not create a security interest merely because it provides that:

\* \* \* \* \* \*

(e) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

fectively creates a conclusive presumption that an option price equal to or greater than the reasonably predictable fair market value does not create a security interest. On the other hand, this court cannot agree with the reasoning of the bankruptcy court to the extent that it implies that simply because the consideration for the option is not nominal under the *per se* test of § 1–201(37)[2] a meaningful reversionary interest exists *ipso facto*. Adopting that reasoning would effectively render the facts and circumstances test irrelevant in all cases in which there was an option to purchase that was for other than a nominal consideration. Yet, "[a]n amount considerably less than fair market value might still be more than nominal value."[31]

The White & Summers view is consistent with the language of § 1–201(37). In the bright-line test of § 1–201(37)[2](d) the statute refers to "nominal" with respect to the option price. On the other hand, § 1–201(37)[3](e) treats a transaction as not creating a security interest where the option price is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be exercised. This recognizes that an option price less than fair market value may still exceed nominal, which is consistent with the fact that the drafters of § 1–201(37) (and the Washington Legislature in adopting it) created two distinct tests. It is a cardinal principle of statutory construction that a statute is to be construed in a manner so as to give each part thereof

meaning and not render any part superfluous; different words must have a different meaning.[32]

■■■■■ In the opinion of this court the test for the determination of the existence of a meaningful reversionary interest that would be adopted by the Washington Supreme Court may be articulated as follows: Under the terms of the lease, does the lessor retain either an up-side gain or a down-side risk at the end of the lease period. In the context of this case it may be stated: If the lease terms provide that at the end of the lease the lessor will receive either return of the leased goods or the reasonably predicted fair market value the goods will have at the time the option is to be performed, the lessor has retained a meaningful reversionary interest. This is consistent with the provisions of § 1–210(37)[3](e) discussed above and § 1–201(37)[4](b):[33]

Moreover, it is consistent with economic reality. While a lease may be structured in such a manner that it is more likely than not that any sensible lessee would exercise it, it may also be structured in such a manner that it is more likely than not that any sensible lessee would not exercise it. That is, it is more likely than not that an option will be exercised if, at the time the lease is entered into, the option price is set too low in relation to the probable value of the leased goods at the time the option is to be exercised. Conversely, it is more likely than not that an

---

31. 4 White & Summers, *supra*, 30–3 e., at page 31, citing Official Comment to § 1–201(37).

32. *Lindsey v. Tacoma—Pierce County Health Dept.*, 195 F.3d 1065, 1074 (9th Cir.1999).

33. For purposes of this subsection (37):
* * * * * *
(b) "Reasonably predictable" and "remaining economic life of the goods" are to

be determined with reference to the facts and circumstances at the time the transaction is entered into;

* * * * * *

option will not be exercised if, at the inception of the lease, an option price is set too high in relation to the probable value at the time of exercise. Only when the option price bears some reasonable relationship to the probable value at the time the option may be exercised can it be said that the agreement contains a true "option." In that situation, if the actual value at the time the option is to be exercised is greater than the predicted value, the lessee more likely than not will exercise the option and obtain a windfall. Conversely, if the actual value at the time the option is to be exercised is substantially less than the predicted value, the lessee is not likely to exercise the option and the lessor bears the risk of a loss. This division of the entrepreneurial risk between the lessor and lessee is sanctioned by revised § 1–210(37).[34]

■ While this court may disagree with the precise wording used by the bankruptcy court in its reasoning that does not necessarily mean that the decision was incorrect or that this case must be remanded to the bankruptcy court. On appeal this court may affirm the decision of the bankruptcy court on any grounds supported by the record, even if the bankruptcy court relied on the wrong grounds or reasoning.[35] The record in this case fully supports that, as a matter of law, the decision of the bankruptcy court holding that the leases in question were true leases, not disguised security interests, was correct under the rule adopted above.

■ Sankey acknowledged in both Options that the purchase price was the closest approximation the parties could make of the value at the end of the lease term. Sankey also concedes that no evidence was introduced to refute this declaration. While the fact the option price is precisely 10% of the purchase price may give rise to suspicions that the option price was not, in fact, the "reasonably predictable fair market value" but instead an arbitrary number; suspicions are not evidence. The lease agreements constitute *prima facie* evidence of their terms and conditions. In the absence of competent evidence to the contrary, a court must accept the documents as being what they purport to be on their face. The fact that at the mid-point of the leases Lease1 equipment has a value of $25,000 and that there is no market to test as to the Lease2 equipment is not probative of the facts and circumstances that existed at the time the leases were entered into. One cannot say, based on those facts, that a price set at 10% of the acquisition costs for an option to be exercised five years in the future is arbitrary or was not a reasonably predictable fair market value. Section 1–201(37)[4](b) makes clear that the issue of true lease versus disguised security interest is determined based on the facts and circumstances existing at the inception of the agreement, not those that exist at some later point. As White and Summers note:

> This is a sensible rule. When the parties sign the contract and become bound, they have either made a lease or a security agreement. That agreement is based on their present judgments about values, useful life, inflation, risk of non-payment and other matters. The agreement may prove to be much more beneficial to one than the other, but that does not change its character once the agreement has been signed. Foresight not

---

**34.** 4 White & Summers, *supra,* § 30–3 c.2, at pages 27–28.

**35.** *Beal Bank v. Crystal Properties Ltd., L.P. (In re Crystal Properties, Ltd. L.P.),* 268 F.3d 743, 755 (9th Cir.2001).

hindsight controls.[36]

**IT IS THEREFORE ORDERED** that the Order Granting Motion for Adequate Protection entered by the Bankruptcy Court on June 3, 2003, is hereby **AFFIRMED.**

---

**36.**   4 White & Summers, *supra,* § 30–3 c.3., at     page 29.