IMPERIAL REFINERIES CORPORATION, appellant, v. LILA MORRISSEY, appellee.

No. 50799.

(Reported in 119 N.W.2d 872)

936

February 12, 1963.

Mahoney, Jordan, Statton & Smith, of Boone, for appellant.

Frank J. Karpan, of Albia, for appellee.

Stuart, J.—This is a suit for specific performance of an option to purchase, contained in a lease. The controversy involves a 40-acre tract abutting U. S. Highway 34 in Jefferson County just west of Fairfield. The land is owned by defendant, an elderly widow. Although her activity is somewhat impaired by age and for convenience much of her business is transacted through her son and her attorney, the record is clear that the defendant is competent to transact business. There is no claim that either defendant's son or her attorney acted except as authorized.

At the time of trial defendant was living in Melrose, Iowa, with her son, John J. Morrissey, a Catholic priest.

Defendant acquired ownership by inheritance, the land having been owned in her family for 100 years. She would like

to have it retained as a family asset. For a number of years there have been two oil stations on the land owned by defendant, the Home Oil and the Imperial Refineries Corporation, plaintiff herein.

On March 4, 1954, the tract of land now used by plaintiff, Imperial Refineries Corporation, was leased by defendant to Hassett Imperial Oil Company. On April 1, 1955, the Hassett Company assigned the lease to plaintiff. By exercise of a renewal option the lease was extended to March 1, 1961. The lease contained the following provisions:

"If this lease be in effect to March 1, 1961, Lessee shall either have the option, right and privilege to purchase the following described property situated in Jefferson County, Iowa, to wit: [land described] at a mutually satisfactory price not to exceed the sum of $22,000 cash or Lessee shall have the right and privilege to renew this lease for a further period of four years commencing the first day of March, 1961, upon the same terms and conditions as are set out in this lease.

"If during the period and term of this lease and any extensions thereof, Lessor, successors or assigns shall have the opportunity to sell the property last above described at a bona fide sale, Lessee shall have the right and privilege of the first refusal thereof at the same price and terms as any bona fide offer for said last above described property."

The lease as typewritten contained the following additional clause "but in no event shall the cost to Lessee exceed the sum of $22,000." This was scratched out before signature.

On November 16, 1960, a realtor wrote defendant that he had an offer to buy her land at $1200 per acre. What, if anything, was done about this offer does not appear. Plaintiff was not informed of this offer at any time prior to trial.

On January 16, 1961, plaintiff notified defendant by letter that plaintiff "does hereby elect to exercise its option to purchase" the 40-acre tract for $22,000 as provided in the lease.

On February 15, 1961, plaintiff mailed defendant a check for $600 designated as one year's rental commencing March 1, 1961. Defendant's attorney returned the check by letter dated February 25, 1961. At the trial plaintiff claimed this check was

mailed in error. The lease expired March 1, 1961, and the option to renew had not been exercised.

On February 20, 1961, Harley F. McIntire made a bona fide offer to purchase the 40-acre tract for $45,000.

On February 21, 1961, defendant's attorney by letter notified plaintiff of this offer.

On February 24, 1961, plaintiff wrote defendant that it had deposited $22,000 in the First National Bank of Fairfield to be paid to defendant upon delivery of warranty deed conveying the land to plaintiff.

On February 24, 1961, defendant's son, Reverend Father John J. Morrissey, addressed to defendant a written offer to buy the 40-acre tract for $60,000, payable $3000 per year plus interest.

On February 27, 1961, defendant's attorney by letter notified plaintiff of this offer. On the same day by previous appointment, but before learning of this last offer, a field representative of plaintiff and plaintiff's attorney met with defendant's attorney and defendant's son. Plaintiff's representatives were told of and were shown the various offers. Plaintiff's representative and attorney stated they would like to check on the McIntire offer. There was general conversation but no firm agreements.

The next day the same people met again. Plaintiff's attorney in behalf of his client offered to meet the McIntire offer of $45,000. A proposed contract and a cashier's check in the amount of $4,500, down payment, were tendered. There was no acceptance on behalf of defendant. Plaintiff reserved no rights in the $22,000 option previously exercised.

Plaintiff's counsel rejected the Morrissey bid as not a legal or bona fide offer. There was much discussion but no conclusion. It is clear, however, that plaintiff made a definite offer to meet the McIntire offer and buy the property for $45,000. There was no acceptance. Defendant's attorney said they relied on the higher offer of $60,000. There is no evidence defendant claimed she could refuse to sell to anyone at this time. There is nothing in the record to show that defendant has ever accepted any of the offers. All that appears is her notice to plaintiff that she had received the offers.

On March 1, 1961, defendant, by her attorney, gave plaintiff notice to quit, stating that plaintiff's lease had expired. This suit followed.

Plaintiff seeks specific performance of its claimed option to purchase for the sum of $22,000. In the alternative plaintiff says it is entitled to purchase for $45,000 if it is not entitled to purchase under its option for $22,000. The trial court denied specific performance. Plaintiff appeals.

I. This suit is in equity and triable de novo here. We give weight to the findings of the trial court but are not bound by them. Rule 344(f)(7), R. C. P.

II. This type of dual option containing both an option to purchase at a specified price during a specified period and the right to purchase at a price offered by a third person is not unusual and has posed many interesting legal problems. As the wording varies in each contract, the specific provision must be examined to determine the intention of the parties. The annotation found in 8 A. L. R.2d 604 presents a review of the cases in which this problem has been involved. As we hold plaintiff waived the right to exercise the option to purchase at a specified price, it is not necessary for us to determine the exact effect of these dual options upon each other.

Plaintiff's claim that it is entitled to specific performance of its option provision at $22,000 is based upon four of the propositions set out in its brief and argument.

"I. The lower court erred in finding that the option was dependent upon defendant's willingness to sell.

"II. The court erred in finding plaintiff failed to timely exercise its option and failed to give proper notice of its election to exercise said option.

"III. When plaintiff gave defendant notice, on January 16, 1961, that it was exercising its purchase option for $22,000, said option became a bilateral contract obligating defendant to sell and plaintiff to buy for $22,000.

"VI. By offering to match the $45,000 offer under threat of loss of business location and pecuniary loss, plaintiff did not waive its rights to enforce its contract of purchase for $22,000."

We need not discuss the first three propositions here-

inabove set out as we hold that plaintiff did not plead nor prove the doctrine of business compulsion and therefore did waive any rights it may have had to enforce the $22,000 option provision.

After representatives of the plaintiff had investigated the McIntire offer of $45,000 and concluded that it was genuine, they tendered defendant's counsel and her son, who were authorized to represent her, a contract in substantially identical form to the offer and a down payment of $4500. The record is void of any evidence indicating they were reserving any rights under the $22,000 option figure. The contract itself is silent as to any such reservation. Mr. Floyd A. Reed, the representative of the company present with the company attorney at the time the contract was tendered, testified:

"You [attorney for plaintiff] made some statements to the effect that you definitely wanted both of them to understand the purpose of our presenting this paper and check, that it was a definite effort to be certain that we complied with the matching offer which had been presented by the McIntire Company."

On cross-examination Mr. Reed testified:

"Q. Well, what I mean Mr. Reed, there were no conditions or strings attached to that offer and that contract that was made in my office? A. No, sir, it was presented to you as an offer to match the other, the McIntire offer."

The notice of the McIntire offer to plaintiff by defendant's counsel in a letter labeling it a bona fide offer to purchase is an offer to sell for that figure which plaintiff accepted by the tender made above.

■ "A provision in a lease giving the lessee the first opportunity to purchase the property for a price the lessor would receive from other parties does not, until the lessor gives notice to the lessee, constitute an 'option' as that term is usually understood. This conditional or contingent right is sometimes called a right of 'preemption' or of 'first refusal.' However, when the lessor sends out notice pursuant to such provision, the two, the provision and the notice, become an option." 51 C. J. S. 632, Landlord and Tenant, section 80; Chournos v. Evona Investment Co., 97 Utah 335, 93 P.2d 450; King v. Dalton Motors Inc., 260 Minn. 124, 109 N.W.2d 51.

This contract which was inconsistent with the option to purchase for $22,000 rescinded the former contract, if one did exist. No rights to assert the former were reserved. Morse v. Slocum, 192 Iowa 1080, 186 N. W. 22; O'Dell v. O'Dell, 238 Iowa 434, 457, 26 N.W.2d 401, 414.

III. Plaintiff's pleadings do not mention business compulsion or allege any ultimate facts which would support this claim. Plaintiff's attorneys apparently recognized this as they sought permission to amend immediately before trial. They later withdrew this request. Although the prayer of the petition is general enough to cover the claim that it is entitled to enforce the $22,000 option, the allegations of the pleadings do not make this claim and in fact seem to assume that plaintiff was required to meet the $45,000 offer.

IV. Even if the doctrine of business compulsion had been pleaded, it would not have been applicable to the instant case. This doctrine requires "that there be some actual or threatened exercise of power, possessed or believed to be possessed by the party exacting or receiving the payment, over the person or property of the person making the payment, from which the latter has no other means of immediate relief than by submitting to the unreasonable or unjust demand and making the payment." 70 C. J. S. 352, Payment, section 147. Although reference in the above quotes is to "payment" it has been held applicable to contracts entered into under similar compulsion.

Plaintiff claims it was compelled to meet the McIntire offer because it was threatened with the loss of its business site and would incur costs of moving as well as loss of business in the interim. At the time it met the McIntire offer, it knew the defendant was relying on a $60,000 offer from her son. Defendant did not force it to accept the $45,000 offer and the acceptance did not alter defendant's conduct in any manner. She still does not want it specifically enforced. Plaintiff apparently was unsure of its ground on the $22,000 option and made a voluntary choice to meet the McIntire offer under its first refusal option abandoning its claim of right to purchase for $22,000. Because of defendant's position, plaintiff was threatened with the same business losses after meeting the

McIntire offer as if it had stood upon its $22,000 option. The meeting of the offer did not remove the threatened loss. This action shows it had an adequate remedy in equity for specific performance aided by an injunction, for, so far as the record shows, its possession remains undisturbed at the present time.

Plaintiff's decision to return to the $22,000 option appears to have been an afterthought. It was not mentioned in negotiations nor pleaded in the lawsuit. Plaintiff made a voluntary choice of available alternatives and cannot revive the rejected one under the claim of business compulsion. Plaintiff was not compelled to enter into the $45,000 contract to prevent injury and loss to its business. Annotation, 79 A. L. R. 655; Inland Empire Refineries v. Jones, 69 Idaho 335, 206 P.2d 519; 17A Am. Jur. 595, Duress and Undue Influence, section 28; 40 Am. Jur. 833, Payment, section 174; Radich v. Hutchins, 95 U. S. 210, 24 L. Ed. 409.

Plaintiff cites the case of Gard v. Razanskas, 248 Iowa 1333, 85 N.W.2d 612, 65 A. L. R.2d 982. It is distinguishable on the facts. In that case the payor had entered into a contract of sale which he had to perform. Payment was made to get title. The defendants in that case did complete the transaction upon the payment of the sum which the court held was not actually due. In the instant case, plaintiff gained nothing from defendant but merely made its position in the resulting lawsuit more secure.

Plaintiff is not entitled to have specific performance of its purchase option for $22,000 for the reasons hereinabove set out.

V. Plaintiff, in the alternative, asks for specific performance of the first refusal option. We have already determined that a contract was made when plaintiff matched the $45,000 McIntire offer. However, at the time plaintiff matched this offer it knew defendant had received an offer from her son, Father John J. Morrissey, in the amount of $60,000. Plaintiff claims that this is not a bona fide offer and that it did not have to meet it. We agree.

On February 24, 1961, at a time when he knew plaintiff desired to exercise its $22,000 option and knew of the McIntire offer

of $45,000, Father Morrissey offered his mother $60,000 for the property in question. The purchase price was to be paid, $3000 down and $3000 per year on the principal for 19 years with interest on the unpaid balance at 6% per year. He was to pay the taxes due in 1962 and all subsequent years and to keep the property insured for $10,000.

Defendant was 86 years old at the time of trial and had made a will leaving this property to her children. Father Morrissey testified he intended to arrange the ownership so that his brothers and sisters would share in the profit or loss with him. Father Morrissey's income was $1000 per year plus room and board and gratuities in an unspecified amount. He owned an automobile and had some defense bonds. He furnished a $3000 certified check as a down payment. The source of this sum is not shown.

He was, by the tendered contract, undertaking an obligation to pay his mother the sum of $6420 the first year, which sum would be reduced at the rate of only $180 per year over the term of the contract. In addition there would be payments for insurance, taxes and upkeep. Father Morrissey's testimony indicates that he had considered the interest to be $342, instead of $3420. He also testified that he thought the property would finance itself, stating that he would open up two new locations on Highway No. 34 and later on develop the farm area for lots and trailer park. The evidence showed the current income from the property was rent from Home Oil Company $1000 per year and Imperial $600 per year. Income from the farm was about $500 per year.

In our opinion the foregoing facts do not support the finding of the trial court that the $60,000 offer was a bona fide offer which plaintiff would be required to meet. We do not question Father Morrissey's motives or good intentions. He undoubtedly would have made every effort to carry out the contract as he considered his purchase of the property a benefit to his mother and to himself. However, an impartial and unbiased purchaser would be unlikely to increase the highest bid by $15,000 or one third of the amount bid. We cannot ignore the facts and circumstances under which the offer was made. Holding this to be

a bona fide offer would provide a device by which an optionor could render ineffective any first refusal option that he might wish to escape.

This is a 20-year contract between an 86-year-old mother and her son who contemplates sharing the property with his brothers and sisters, all of whom will inherit the balance unpaid on the contract at their mother's death. The life expectancy of defendant according to 1958 Commissioners Standard Ordinary Mortality Table is only 4.06 years.

For an offer to be considered a bona fide offer, it must be shown with reasonable certainty that offeror possessed the financial ability to comply with the terms of the contract. Proof which indicates the offeror is operating on a shoestring speculation or attractive probabilities falls short of reasonable certainty. Shell Oil Co. v. Kapler, 235 Minn. 292, 50 N.W.2d 707; Sharp v. United States, 191 U. S. 341, 24 S. Ct. 114, 48 L. Ed. 211.

The evidence does not disclose any possible way that Father Morrissey could meet the onerous payments out of his income including the income from the property. Even if he were successful in renting all four frontages for $1000 per year, received $500 from the farm operation and contributed his whole salary of $1000 he would still be $920 short of being able to meet the first payment. This does not take into consideration the necessary expenses for insurance, taxes or upkeep.

These facts do not disclose a bona fide offer which plaintiff should be compelled to meet to exercise its first refusal option.

VI. The trial court found and the defendant urges that the option was dependent upon defendant's willingness to sell. Several cases involving first refusal options are cited. As stated above this was true until defendant gave notice of a bona fide offer. After receiving notice of the plaintiff's intent to exercise the option at $22,000 defendant notified it of a bona fide offer at $45,000, enclosing a copy thereof. There could have been no purpose in submitting the offer other than notifying plaintiff that defendant had received such an offer and wanted to give plaintiff a chance to meet it. According to the authorities set out above, it then became an option which was accepted by plaintiff. Apparently defendant was no more sure of her position on the

$22,000 option than plaintiff was, for she could have notified it that she considered the option inequitable and unenforceable. Instead she sought the higher figure of $45,000 which she later attempted to increase to $60,000. There is no evidence that defendant prior to trial claimed she could not be compelled to sell or was unwilling to sell.

VII. Trial court also found and defendant argues that the option was for less than one half the value of the real estate and was an unfair contract, greatly overreaching the defendant, an elderly woman inexperienced in business affairs and without legal counsel at the time. Authorities cited support the well recognized rule that specific performance is a matter of equity rather than strict right and rests with the sound discretion of the court and will be granted only when it is equitable to do so. DeJong v. Huyser, 233 Iowa 1315, 11 N.W.2d 566; Staly v. Mc-Nerney, 233 Iowa 1065, 10 N.W.2d 584; Vermeulen v. Meyer, 238 Iowa 1033, 29 N.W.2d 232. We do not disagree with these announced rules but with their application to this case. No authorities cited by defendant approach the instant case on the facts.

Whether an option contract is so inequitable that it should not be enforced in equity "is to be determined not as of the date when it was finally exercised, but upon the situation as it existed when the contract was entered into." Larson v. Smith, 174 Iowa 619, 626, 156 N.W. 813; Shell Oil Co. v. Kapler, 235 Minn. 292, 50 N.W.2d 707; 91 C.J.S. 846, Vendor and Purchaser, Section 6; Annotation, 11 A. L. R.2d 397. The adequacy of the consideration should also be determined as of the inception of the option rather than according to the increased value of the property at the time of the action. Shell Oil Co. v. Kapler, supra; Annotation, 11 A. L. R.2d 406.

There is little evidence in the record concerning the execution of the lease which contained the options. Mr. Joseph E. Luckett, representative of plaintiff, testified that for the most part the negotiations were carried on in Mrs. Morrissey's home in Ottumwa. He did not recall discussing the lease with Mrs. Morrissey in the presence of her attorney. The negotiations were not continuous and she had a copy of the lease and could have consulted an attorney.

Mrs. Lila Morrissey testified over objection that she did not wish to sell the property and did not know she would have to sell it under the option. She did not have an attorney when the lease was drawn. She does not claim that Mr. Luckett made any false statements or misrepresentations concerning the lease or its contents or the value of the property. Defendant through her son's testimony clearly establishes her competency at time of trial. She was seven years younger when the lease was executed. She examined the lease and changes were made in its contents. The very provisions under discussion were altered in ink. The further period for renewal of the lease was reduced from five years to four years. The provision which would have limited the first refusal option to a figure "not to exceed $22,000" was scratched out. The court comments upon the harshness of the provisions, but they vary little from those contained in many of the cases found in the citations and annotations.

There is no evidence as to the value of the 40 acres on the fourth day of March, 1954, when the lease was executed. Dave Carpenter, owner of the Home Oil Company located on this tract of ground and who was interested in the property himself, testified as follows:

"Q. At that time [1954] what in your opinion was the fair and reasonable market value of a frontage on a highway for a filling station site? [objection] A. I did purchase a filling station location in Ottumwa, Iowa, on Highway 63 that involved 400 feet of frontage at $30.00 per front foot.

"Q. What in your opinion would have been a reasonable, fair market value of frontage for a filling station site on this forty-acre tract that Mrs. Morrissey owns? [objection] A. This particular location that I was leasing from Mrs. Morrissey had a value in excess of $30.00 per front foot for filling station use."

Mr. McIntire, defendant's other value witness, testified:

"Q. Would you have an opinion as to the fair market value of the frontage of the Morrissey property in 1954? [objection] A. Of course the land has gone up considerably since that time. I would say that the land in that area probably, you are speaking of a running foot, 300 feet? A. Yes. A. I believe that property at that time would run about $75.00 a running foot."

Mr. McIntire's value testimony was very unsatisfactory. He was in the army in 1954 and had only been in the real-estate business four years. He said the quarter-mile frontage was "worth" $132,000 in 1961 but ended up saying "there is a difference between selling off a piece of foot frontage and telling somebody it is going to bring $132,000 because you know it won't and I do too."

There is no way that a trier of the fact could arrive at the value of the 40-acre tract in 1954 from this evidence. It is limited to a front-foot value of about at 300-foot frontage. The evidence does not support the finding of the trial court that the 40 acres was worth $45,000 in 1954. There is no claim of any conduct on the part of plaintiff's representatives by which they sought to take advantage of defendant or mislead her in any way. The lease was in her possession some time before signing. The trial court was concerned with the option to purchase for $22,000 and the present-day value which he placed at $60,000. We, however, are not enforcing specific performance of the $22,000 option and do not agree that the evidence shows present value of the property to be $60,000.

"An increase in the value of the land between the time of making the contract and the time when the action for specific performance is brought or the decree is made has, in a great majority of the cases, been held not to be a sufficient ground for denying specific performance of a contract involving the conveyance of land, in the absence of other circumstances justifying such denial." 11 A. L. R.2d 406; see also 81 C. J. S. 560, section 63. We find no such other circumstances in the instant case and hold that the contract at the time it was executed was not so unreasonable, unfair or overreaching that it would be unconscionable to enforce it. Plaintiff has met the highest firm bid received by defendant and communicated to plaintiff. It is entitled to specific performance of the contract tendered for a consideration of $45,000.

VIII. Defendant also urges that the plaintiff did not exercise the option in the unqualified, unambiguous, positive manner required by law. While there may have been some confusion involved in the events subsequent to the notice of intent

948

to exercise the $22,000 option, there was no such confusion in the acceptance of the first refusal option when plaintiff met the McIntire offer. This was the last transaction between the parties prior to the notice to quit which precipitated this lawsuit. The contract tendered at that time was identical in terms with the McIntire offer. The down payment tendered was in the same amount. Mr. Reed's undisputed testimony set out above makes it clear that plaintiff intended an unqualified and unambiguous acceptance of the McIntire offer.

IX. Other matters urged by defendant in support of the decision of the trial court are applicable to the $22,000 option and as we have held in defendant's favor on this proposition on other grounds, these matters need not be discussed.

The case is reversed and remanded with direction to the trial court to enter a decree of specific performance in accordance with contract submitted by plaintiff to defendant, dated February 28, 1961, and referred to in the Record as Plaintiff's Exhibit 13.—Reversed and remanded.

All JUSTICES concur.