# IN THE COURT OF APPEALS OF IOWA

No. 15-2047
Filed March 22, 2017


**GENE L. FRANKLIN and CONNIE JOHNSON, EXECUTORS OF THE FAE BLACK ESTATE; GENE L. FRANKLIN, CONNIE JOHNSON, CURTIS L. FRANKLIN, and GREGORY S. FRANKLIN,**
     Plaintiffs-Appellees/Cross-Appellants,

**vs.**

**MICHAEL JOHNSTON, ELIZABETH JOHNSTON, STEVE JOHNSTON, KASONDRA JOHNSTON, JAMES YEAGER, and JUDITH YEAGER,**
     Defendants-Appellants/Cross-Appellees.
_____


Appeal from the Iowa District Court for Van Buren County, Lucy J. Gamon (partial summary judgment ruling) and Randy S. DeGeest (trial), Judges.


Adjoining property owners both appeal the district court's decision interpreting an easement agreement entered into by the predecessors in title. **AFFIRMED IN PART, MODIFIED IN PART, AND REMANDED.**


James E. Nervig of Brick Gentry, P.C., West Des Moines, and Lucas C. Helling and Vanessa M. Y. Willman of Foss, Kuiken & Cochran, P.C., Fairfield, for appellants/cross-appellees.

Michael C. Vance of Vance Law Office, Mt. Pleasant, for appellees/cross-appellants.


Heard by Danilson, C.J., and Vogel and Vaitheswaran, JJ.

**VOGEL, Judge.**

Michael Johnston, Elizabeth Johnston, Steve Johnston, Kasondra Johnston, James Yeager, and Judith Yeager (the Johnstons) appeal, and Gene Franklin and Connie Franklin, individually and as executors of the Fae Black Estate, Curtis Franklin, Julie Pedrick, Bruce Franklin, and Gregory Franklin (the Franklins) cross-appeal the district court's decisions rendered in this litigation pertaining to the interpretation of a 1962 "Easement and Agreement." The Johnstons and the Franklins are adjoining property owners in rural Van Buren County. The predecessors in title to the properties entered into the easement and agreement allowing for the construction of a dam on the Johnstons' property that resulted in the creation of a 14-acre lake, which spilled onto and covered a portion of both properties. After more than fifty years of enjoyment of the lake by both property owners, the parties are now disputing the extent of each other's rights to access and use the lake, along with disputing the boundary line between the properties. The Johnstons in their appeal raise nine issues related to the district court's decisions; in their cross-appeal, the Franklins raise two additional issues. For the reasons expressed herein, we affirm in part and modify in part the district court's decision.

## I. Background Facts and Proceedings.

The Johnstons' predecessors in title, Otto and Pauline Estle, desired to create a lake on their rural Van Buren County property, but they knew if they erected a dam the collected water would back up onto the neighboring property, then owned by James and Fae Franklin. The adjoining property owners signed a

document entitled "Easement and Agreement" in April 1962. The document

provided the Estles were granted a "perpetual easement" by the Franklins

> for the right to occasion overflow by water from the land of the [Estles] to and on and over the lands of [James and Fae Franklin] such as would be occasioned by the construction of a dam not to exceed forty (40) feet in height in a ditch located on the land of the [Estles,] which ditch traverse the property of [James and Fae Franklin], and [the Estles] are hereby granted the perpetual right to erect and maintain such dam and thereby occasion an overflow of water onto and over such portion of [James and Fae Franklin's] land as may be occasioned by the construction of said dam not to exceed forty feet, in height.

The agreement went on to provide:

> It is stipulated and agreed by and between the parties hereto that [James and Fae Franklin] shall have the right to pasture their stock in the fields on to which water may rise on their property and [James and Fae Franklin] shall have the right to fish in said waters and to use such area as is overflowed by water for their own proper and lawful individual purposes.
> It is specifically understood and agreed by and between the parties hereto that [James and Fae Franklin] shall have no right to commercialize the area so overflowed by water on their own lands nor to permit the use of said water by parties other than [James and Fae Franklin] or their successors in ownership of said land.
> It is further understood and agreed by way of explanation but not by limitation, that commercialization is intended to mean that [James and Fae Franklin] shall permit the construction of no cabins in said area, shall not permit fishing in such waters by persons other than themselves and the immediate members of their family; that they shall not permit the public generally to fish in or use said overflowed area for boating or other recreational purposes.
> It is further specifically understood and agreed that in the event [James and Fae Franklin] should at any time elect to sell their premises or in any other manner dispose of or alienate the title to their lands that they shall and do hereby grant, sell, and convey unto the [Estles] their heirs, successors, administrators, or assigns, the first right and option to purchase such overflowed area together with a strip of land surrounding said overflowed area not to exceed twenty (20) feet in width from the shoreline of said overflowed area at and for the same price as [James and Fae Franklin] receive by way of a bona fide offer for the purchase thereof.

The dam was constructed, but the Estles died in the late 1960s. The Estles' estate conveyed the property, including the dam, to Robert and Imogene Johnston in 1971, and Robert erected a fence on the north side of the lake between his property and the Franklin property running from the highway to the water. Robert informed James Franklin where the boundary line was, and James believed him. Together the two completed the fence. Thereafter, Clark and Alice Johnston purchased the property from the Robert Johnston estate in 1986. Clark and Alice have since conveyed various pieces of that property to their children, the defendants—the Johnstons—in this case.

James and Fae Franklin divorced in 1979, and ownership of the land in question was conveyed to Fae alone. Fae then married James Black and conveyed title to herself and James in joint tenancy, but after James's death, title to the property again was solely in Fae's name. Fae died in June 2012, and her will left the property to her children, the plaintiffs—the Franklins—in this action.

The parties' dispute began after Fae died. It was discovered Mike Johnston's house that was believed to be entirely on the Johnstons' property was partially located on the Franklins' property after a 2007 survey determined the fence line erected by James Franklin and Robert Johnston did not follow the true boundary line between the properties. In response, the Johnstons told the Franklins they could no longer use the portion of the lake that covered the Johnstons' land. Of the fourteen-acre lake, a little more than four acres covers the Franklins' land, while the remaining lake, including the dam, covers the Johnstons' property. The Johnstons enlisted the help of the local sheriff to inform the Franklins that they were not to trespass on the Johnstons' side of the lake.

The Franklins filed suit in May 2013, asserting the right of first refusal in the 1962 easement and agreement was no longer valid and the restrictive covenants contained in the agreement were stale pursuant to Iowa Code section 614.24 (2013). The Franklins further requested the court declare they had the right to use the entire lake by way of an easement and asked that the true boundary line between the properties be established. The Franklins further amended their petition in May 2014 to add a claim for a civil rights violation under 42 U.S.C. § 1983, alleging the Johnstons worked in collusion with the county sheriff to deprive the Franklins of their property rights. The Johnstons denied the allegations in the amended petition, and in August 2014, both parties moved for partial summary judgment.

After a hearing, the district court granted in part the partial summary judgment motions on October 10, 2014. The court found the use restriction—specifically the restriction from commercializing the Franklins' property—was no longer valid in light of section 614.24. The court determined the provision in the easement agreement that gave the Johnstons the right of first refusal to purchase the Franklins' property surrounding the lake did not yet violate the rule against perpetuities in light of the legislative amendment to "wait and see," but the court found the right of first refusal did violate the rule against restraints on alienation of land and was therefore invalid. The court declared the fence line on the north side of the lake to be the boundary line between the two properties pursuant to Iowa Code section 650.14—boundary by acquiescence. But the court denied the motion with respect to establishing a boundary on the south side of the lake, finding material issues of fact were in dispute. Finally, the court also

denied the motion with respect to the section 1983 action, finding the Franklins had made a "prima facie" case. The court noted the ultimate dispute underlying the section 1983 action was still undecided—whether the Franklins had a right to use the entire lake. This issue was not before the court as part of the summary judgment action.

The case then proceeded to a bench trial in September 2015 with the remaining issues including the extent of the Franklins' right to use the lake, the existence of the boundary line through the lake and to the south of the lake, whether the Johnstons were liable under section 1983, and whether the Johnstons have the legal right to drain the lake. The court issued its ruling in November 2015, finding the Franklins were entitled to use the entire lake by way of an express easement, and alternatively, by way of a prescriptive easement and an implied easement, and "that each party has a reciprocal easement to use the other parties' part of the lake that lies above their land." The court found the boundary through and to the south of the lake was the deeded boundary line after concluding no boundary by acquiescence existed in this area. Thus, from the last fence post on the shoreline on the north side of the lake, the court ordered the boundary line would proceed east at a right angle until it connected with the deeded line. The court concluded the Franklins did not prove their civil rights violation claim under section 1983 after determining the county sheriff acted independently and in good faith. Finally, the court concluded the 1962 easement and agreement did not require the Johnstons' predecessor in title to construct the dam that created the lake and, therefore, there was nothing to require the lake exist in perpetuity.

After the court denied the parties' posttrial motions, both parties appealed from the district court's orders.

## II. Scope and Standard of Review.

The parties challenge both the district court's ruling on partial summary judgment and the district court's trial ruling. We review decisions on motions for summary judgment for the correction of errors at law. *Stew-Mc Dev., Inc. v. Fischer*, 770 N.W.2d 839, 844 (Iowa 2009) ("Summary judgment is appropriate when, after review of the entire record, there is no genuine issue of material fact."). The parties both agree the trial on the remaining issues was heard in equity; therefore, our review is de novo. *See Passehl Estate v. Passehl*, 712 N.W.2d 408, 414 (Iowa 2006) ("Our review of actions for declaratory judgment depends upon how the action was tried to the district court. . . . Because this matter was tried by the district court wholly in equity, we review this appeal de novo."). To the extent the parties challenge the district court's interpretation of the applicable statutes, our review is for the correction of errors at law. *See Van Sloun v. Agans Bros. Inc.*, 778 N.W.2d 174, 182 (Iowa 2010) ("The court reviews issues involving the interpretation of statutes for correction of errors at law.").

## III. The Johnstons' Appeal.

### A. Use Restrictions.

For their first claim on appeal, the Johnstons assert the district court incorrectly determined the portion of the agreement that contained the use restriction, preventing the Franklins from commercializing their side of the lake, was no longer valid by application of Iowa Code section 614.24—the stale use statute.

This statutory provision provides in pertinent part:

No action based upon any claim arising or existing by reason of the provisions of any deed or conveyance or contract or will reserving or providing for any reversion, reverted interests or use restrictions in and to the land therein described shall be maintained either at law or in equity in any court to recover real estate in this state or to recover or establish any interest therein or claim thereto, legal or equitable, against the holder of the record title to such real estate in possession after twenty-one years from the recording of such deed of conveyance or contract or after twenty-one years from the admission of said will to probate unless the claimant shall . . . file a verified claim with the recorder of the county wherein said real estate is located within said twenty-one year period.

Iowa Code § 614.24(1).  "If a claim is properly filed, it extends or preserves the time to bring an action on the claim for an additional twenty-one years."  *Fjords N., Inc. v. Hahn*, 710 N.W.2d 731, 735 (Iowa 2006) (citing Iowa Code § 614.25).  The purpose of the statute was to simplify land transfers by "shortening the title-search period for these types of claims" but allowing for these claims to be kept alive if desired.  *Id.*

A special distinction was subsequently brought to light that the "use restrictions" referenced in section 614.24 only apply to negative easements, not affirmative easements.  *See Amana Soc'y v. Colony Inn, Inc.*, 315 N.W.2d 101, 109–10 (Iowa 1982) ("[I]t was not the intent of those who prepared the bill to include [affirmative grants or reservation of property interests] within the ambit of the limitation act.  What we were trying to do was to limit stale uses and reversions and not to bar interest in land granted or reserved.  We are trying to distinguish a negative easement or a perpetual right of reentry.  An 'easement' providing for use and occupancy of land is an entirely different class from a restriction on use imposed on a grantee of the land." (alterations in original)

(citation omitted)). A negative easement is "a restriction[] on the use of one's own land," while an affirmative easement is "the right of a limited use of the land of another." *Id.* at 110 (citation omitted). The stale use statute thus only applies to the former type of restriction—the negative easement.

The disputed provision in the 1962 easement and agreement provides:

It is specifically understood and agreed by and between the parties hereto that [James and Fae Franklin] shall have no right to commercialize the area so overflowed by water on their own lands nor to permit the use of said water by parties other than [James and Fae Franklin] or their successors in ownership of said land.

It is further understood and agreed by way of explanation but not by limitation, that commercialization is intended to mean that [James and Fae Franklin] shall permit the construction of no cabins in said area, shall not permit fishing in such waters by persons other than themselves and the immediate members of their family; that they shall not permit the public generally to fish in or use said overflowed area for boating or other recreational purposes.

We agree with the district court's conclusion that this provision in the parties' contract that restricts the Franklins' use of their own property to noncommercial purposes only is a negative easement. *See id.* ("For purposes of applying the stale use statute, we hold the deed restrictions on the business use of the properties to be 'negative' easements subject to the statute as 'use restrictions.'"). The Johnstons assert the 1962 easement and agreement was in fact "an executory contract establishing an easement by express written grant." As shown above, section 614.24 specifically includes contracts among the instruments that are governed by the stale use restrictions. *See* Iowa Code § 614.24(1) ("No action based upon any claim arising or existing by reason of the provisions of any deed or conveyance or *contract* or will . . . ." (emphasis added)); *Fjords N.,* 710 N.W.2d at 736 ("Thus, the statute applies to claims

based on three types of provisions (reversion interests, reverted interests, and use restrictions) contained in one of four types of instruments (deed, conveyance, *contract*, or will)." (emphasis added)).  The Johnstons do not cite any law to support their assertion that "executory contracts" are exempt from the application of the statute, and we find no reason for such a distinction.

The Johnstons also assert that a recent amendment to section 614.24, enacted after the lawsuit was filed but before the case went to trial,[1] demonstrates that the restrictions at issue in this case are not "use restrictions." In 2014, the legislature enacted for the first time a definition of "use restrictions," which provided a use restriction in section 614.24 was

> [a] limitation or prohibition on the rights of a landowner to make use of the landowner's real estate, including but not limited to limitations or prohibitions on commercial uses, rental use, parking and storage of recreational vehicles and their attachments, ownership of pets, outdoor domestic uses, construction and use of accessory structures, building dimensions and colors, building construction materials, and landscaping.  As used in this section, "use restrictions" does not include any of the following:
> a. An easement granting a person an affirmative right to use land in the possession of another person including but not limited to an easement for pedestrian or vehicular access, reasonable

---

[1] In 2014, the legislature officially adopted a definition of "use restrictions."  *See* 2014 Iowa Acts ch 1067, § 1.  The prior version of the statute did not provide a definition, and thus, the Johnstons assert the added definition "clarified," but did not change, the statute.  *See Bd. of Trs. v. City of W. Des Moines*, 587 N.W.2d 227, 230 (Iowa 1998) ("When confronted with the interpretation of a statute which has been amended prior to trial, we employ a two-tiered analysis.  If the amendment clarifies the statute, the former statute is interpreted with the aid of the legislative clarification.  On the other hand, if the amendment changes the statute and the change helps resolve the underlying disputed issue, the amendment becomes the focus of the inquiry and the court must determine if the legislature intended the change to apply retrospectively or prospectively." (internal citation omitted)).  Because we conclude the new definition does not alter our analysis of the facts of this case, we need not address whether the 2014 statutory enactment is a clarification or whether it changed the substantive law, nor do we need to address whether it had retroactive effect.

ingress and egress, solar access, utilities, supporting utilities, parking areas, bicycle paths, and water flow.

b. An agreement between two or more parcel owners providing for the sharing of costs and other obligations for real estate taxes, insurance premiums, and for maintenance, repair, improvements, services, or other costs related to two or more parcels of real estate regardless of whether the parties to the agreement are owners of individual lots or incorporated or unincorporated lots or have ownership interests in common areas in a horizontal property regime or residential housing development.

c. An agreement between two or more parcel owners for the joint use and maintenance of driveways, party walls, landscaping, fences, wells, roads, common areas, waterways, or bodies of water.

2014 Iowa Acts ch 1067, § 1. It is the final paragraph (c) that the Johnstons assert exempts the provision in the parties' agreement from the definition of "use restrictions" because the language restricting the commercial use of the Franklins' property is an agreement "for the joint use and maintenance of . . . bodies of water." However, we do not interpret the 1962 easement and agreement language so broadly.

Under the Johnstons' own interpretation of the 1962 agreement, there is no language that provides for the "joint use" of the water. It is the Johnstons' position on appeal that the Franklins have no right to use the water flowing above the Johnstons' land. According to the Johnstons, the agreement as a whole is meant to restrict each party to their own side of the lake. Therefore, the provision at issue in the parties' agreement only serves to restrict the Franklins from using their own property for commercial enterprises, and restricts them from permitting persons, other than family members, from fishing, boating, or other recreational purposes in the water covering their own land; it does not pertain to the joint use of the water. Nor does the agreement provide for the joint maintenance of the

body of water. The only maintenance provision in the agreement states the Johnstons have a "perpetual right to erect and maintain such dam." There is no language pertaining to the sharing of responsibilities for the maintenance of the lake created by the dam or a cost-sharing agreement for the financial expense of maintaining the lake as a whole.

Therefore, assuming without deciding the 2014 statutory addition to section 614.24 is applicable to the dispute in this case, the added definition of "use restrictions" does not exempt this agreement from the application of the twenty-one-year limitation. Because more than twenty-one years has passed since the parties entered into the agreement and it is undisputed no party filed a verified claim within that time period, so as to extend the life of the use restriction, we agree with the district court this use restriction has expired and is no longer enforceable.

### B. Right of First Refusal.

Next, the Johnstons assert the district court incorrectly determined the language in the agreement giving them the right of first refusal to purchase the Franklins' property encompassing the lake and twenty feet of shoreline is no longer enforceable. While the district court did find the right of first refusal did not yet violate the rule against perpetuities in Iowa Code section 558.68 in light of the "wait-and-see" approach, *see* Iowa Code § 558.68(2)(a), the court did conclude the provision was unenforceable under the common law rule against restraints on the alienation of land. *See Trecker v. Langel*, 298 N.W.2d 289, 291 (Iowa 1980)

("Preemptions[2] are subject to the rule against perpetuities and the rule against restraints on alienation. The rules share the common objective of keeping property freely alienable. The rule against perpetuities does so by fixing the time within which a future interest must vest, whereas the rule against restraints on alienation bars direct restraints on the alienability of present or future vested interests.").

The district court noted that for the right of first refusal to be valid under the rule against restraints on alienation it must be reasonable. *Id.* at 292 (noting a right of preemption at a fixed price must be "reasonable under the circumstances" in order to be valid (citation omitted)); *see also* Restatement (Third) of Property (Servitudes) § 3.4 (2000) ("A servitude that imposes a direct restraint on alienation of the burdened estate is invalid if the restraint is unreasonable. Reasonableness is determined by weighing the utility of the restraint against the injurious consequences of enforcing the restraint."). The district court analyzed the factors enunciated in *Trecker* to determine whether the right of first refusal was reasonable; those factors, if found, that make the right reasonable include:

> 1. the one imposing the restraint has some interest in land which he is seeking to protect by the enforcement of the restraint;
> 2. the restraint is limited in duration;
> 3. the enforcement of the restraint accomplishes a worthwhile purpose;

---

[2] The *Trecker* court distinguished between an option and a preemption, and defined preemption to be the right to "require[] the owner, when and if he decides to sell, to offer the property first to the person entitled to the preemption." 298 N.W.2d at 290–91 (citation omitted); *see also Imperial Refineries Corp. v. Morrissey*, 119 N.W.2d 872, 876 (Iowa 1963) (noting the conditional or contingent right to purchase is interchangeably referred to as both a right of preemption and a right of first refusal).

> 4. the type of conveyances prohibited are ones not likely to be employed to any substantial degree by the one restrained;
> 5. the number of persons to whom alienation is prohibited is small[;]
> 6. the one upon whom the restraint is imposed is a charity.

298 N.W.2d at 292; *see also* Restatement (Third) of Property (Servitudes) § 3.4, cmt. f (Am. Law Inst. 2000) ("Whether a right of first refusal is valid depends on the legitimacy of the purpose, the price at which the holder may purchase the land, and the procedures for exercising the right.").

The right of first refusal in the parties' 1962 easement and agreement provides:

> It is further specifically understood and agreed that in the event [James and Fae Franklin] should at any time elect to sell their premises or in any other manner dispose of or alienate the title to their lands that they shall and do hereby grant, sell, and convey unto the [Estles,] their heirs, successors, administrators, or assigns, the first right and option to purchase such overflowed area together with a strip of land surrounding said overflowed area not to exceed twenty (20) feet in width from the shoreline of said overflowed area at and for the same price as [James and Fae Franklin] receive by way of a bona fide offer for the purchase thereof.

The district court noted only one of the *Trecker* factors favored finding the right of first refusal reasonable—the Johnstons, as adjoining landowners, had some interest in the land that they were seeking to protect by the enforcement of the restraint. The court concluded the restraint was unreasonable because it was of unlimited duration, the restraint did not accomplish a worthwhile purpose, the provision restrained all types of conveyances, the number of people restrained was not small, and the Franklins are not a charity. The Johnstons take issue with three of these factors.

1. *Duration.* The Johnstons note that the court had determined the right of first refusal would expire under the wait-and-see approach of the rule against perpetuities after the passage of twenty-one years from the death of Fae—June 21, 2033. Therefore, the Johnstons assert the district court was incorrect to determine the duration of the right of first refusal was unlimited. The language used in the agreement is of unlimited duration, and it is only after the application of the rule against perpetuities following the death of the measuring life that the parties have any sense of the timing of the termination of the right. Assuming we can use that end date in our assessment of the duration of the right, instead of the interminable language used by the contracting parties, we still conclude that a right of first refusal lasting over seventy-one years is not "limited in duration" so as to make this provision reasonable. *See Trecker*, 298 N.W.2d at 292. We additionally note there is no limit to the amount of time the Johnstons have to decide whether to exercise their right of first refusal upon notification that a third party has made an offer to purchase the property. *See Girard v. Myers*, 694 P.2d 678, 684 (Wash. Ct. App. 1985) (focusing the duration analysis on the time "within which the holder [of the right] must act"). Again, an unlimited duration is not reasonable.

2. *Worthwhile Purpose.* Next, the Johnstons assert the purpose behind the right of first refusal is worthwhile—their ability to protect and safeguard their property, including the dam, from commercial development. However, the Johnstons desire for us to interpret the written agreement to restrict the Franklins' use of the lake to the water flowing only above the Franklins' land. It is unclear how the use of this portion of the lake would have any effect, let alone an

adverse effect, on the Johnstons' ability to protect and safeguard their property on the other side of the lake. Essentially, the Johnstons want to prohibit commercial development on the lake and protect their solitude and exclusive use of the lake for their own benefit. While this purpose is not malicious, capricious, or spiteful, it only serves to benefit the Johnstons' property values. *See Trecker*, 298 N.W.2d at 292 (noting a right of first refusal is considered unreasonable if it is capricious or imposed for spite or malice); *Cape May Harbor Vill. & Yacht Club Ass'n, Inc. v. Sbraga*, 22 A.3d 158, 169 (N.J. Super. Ct. App. Div. 2011) ("The enforcement of the restraint accomplishes a worthwhile purpose by preserving the stable residential character of the community. That character has never before been marked by weekly rentals to vacationers, and the Association members had a rational basis for believing that the peace and tranquility of the community would be disrupted if such rentals were permitted."). *But see Kerley v. Nu-W., Inc.*, 762 P.2d 631, 636 (Ariz. Ct. App. 1988) ("[T]he law assumes that encouraging the development and resale of real estate is worthwhile."); *City of Oceanside v. McKenna*, 264 Cal. Rptr. 275, 279 n.4 (Cal. Ct. App. 1989) ("The traditional rule against restraints on alienation is based on the public policy notion that the free alienability of property fosters economic and commercial development."). We agree with the district court that this factor leans toward finding the right of first refusal unreasonable.

3. *Number Restrained.* Finally, the Johnstons assert the district court was wrong to focus on the number of people affected by the restraint—the restraint now impacts Fae's heirs under her will, her six children. The Johnstons assert that "common sense dictates" that this factor should focus on the size of parcels

restrained and not how many people own a particular parcel. Because only one parcel is restrained—now jointly owned by Fae's children under the will—the Johnstons assert the restraint should be found to be reasonable.

The Johnstons cite no authority for their assertion we should focus on the size or number of parcels involved, and we note the factor is described in *Trecker* as "the number of *persons* to whom alienation is prohibited." 298 N.W.2d at 292 (emphasis added). At this time six people have an ownership interest in the Franklins property, and the Johnston property surrounding the lake has been divided into three parcels now owned by six people. The 1962 agreement is unclear whether the right of first refusal extends to the Johnstons individually or only en masse.

Beyond the *Trecker* factors, the right also suffers from a lack of clarity as to how and when notice is to be given, how swiftly the Johnstons must respond, and what portion of the Franklins' property is subject to the right in light of the fluctuating nature of a "shoreline." We agree with the district court's determination that the right of first refusal violates the rule against restraints on the alienation of land and is therefore unenforceable.

### C. Easement.

Next, the Johnstons assert the Franklins only have the right to use that part of the lake that covers their land, a little more than four acres of the west end of the lake. The district court concluded the Franklins have the right to enjoy the entire lake, including the water that flows above the Johnstons' property. The district court found the Franklins' right flows from an express easement, a prescriptive easement, and an implied easement resulting in each party having a

reciprocal easement to use the other party's portion of the lake. Because we conclude a prescriptive easement exists, we need not address the issue of express easement or implied easement.

A prescriptive easement is established "when a person uses another's land under a claim of right or color of title, openly, notoriously, continuously, and hostilely for ten years or more." *Johnson v. Kaster*, 637 N.W.2d 174, 178 (Iowa 2001); *see also* Iowa Code § 564.1. A claim for a prescriptive easement is similar to adverse possession, except an easement concerns the use of the property and adverse possession concerns the acquisition of title to the property. *Johnson*, 637 N.W.2d at 178. Whenever a party seeks to prove a prescriptive easement, Iowa Code section 564.13 requires proof of adverse possession apart from mere use of the property and requires the owner of the servient estate to have express notice of the claim. "An express easement for a limited use may be expanded by prescription." *Larman v. State*, 552 N.W.2d 158, 161 (Iowa 1996). However, the permissive use of land may become a prescriptive easement "only [where] the party claiming the easement has expended substantial amounts of labor or money in reliance upon the servient owner's consent or his oral agreement to the use." *Id.* (alteration in original) (citation omitted). Unless a landowner knows another has a hostile claim to use its land, "the landowner may incorrectly assume the other's use results merely from the landowner's willingness to accommodate the other's desire or need to use the land." *Id.* at 162.

The Johnstons assert there is no prescriptive easement because the Franklins' use of the Johnstons' side of the lake was not hostile or under a claim

of right or color of title. The Johnstons claim the Franklins' use of their side of the lake was merely permissive, asserting their predecessors in title had allowed the Franklin family to use the entire lake without requiring them to ask for permission as a neighborly courtesy. They claim the Franklins never notified them of their claim of right, either verbally or in writing, until immediately before the litigation was imminent.

1.  *Hostility.*  Hostility does not imply ill-will but instead refers to declarations made or acts done that reveal a claim of exclusive right to the land. *Johnson*, 637 N.W.2d at 178.  As stated above, mere use of the land does not ripen into an easement, but a party claiming an easement must prove its claim through some other specific act or conduct.  *Id.*  Actions such as maintaining or improving the land can support a claim of a prescriptive easement.  *Id.* at 179. "This court has relaxed the traditional requirements for a prescriptive easement 'in those situations in which the party claiming the easement has expended substantial amounts of labor or money in reliance upon the servient owner's consent or his oral agreement to the use.'"  *Brede v. Koop*, 706 N.W.2d 824, 828 (Iowa 2005) (citation omitted).

Until this action was filed, both families in this case have continued to use the entire lake for over fifty years without ever seeking the other parties' permission.  But use alone is not sufficient to establish a prescriptive easement. The district court noted the Franklins, specifically Fae and James Black, improved the lake by constructing a silt basin to prevent silt from coming down the main channel of water.  From the invoices submitted as evidence, the construction of the silt basin occurred in the summer of 2001.  In addition, Mike

Johnston, one of the defendants, admitted to being aware of the construction of this silt basin. The testimony of plaintiff Gene Franklin, and of Keith Johnson, who is married to plaintiff Connie Johnson, also established that Mike Johnston and Fae both paid to install a "draw down tube" at the dam area on the Johnstons' side of the lake. In addition, hedge posts were installed to further prevent silt from coming into the lake. Finally, plaintiff Greg Franklin testified James Black told him he paid to stock bass and catfish in the lake in the 1990s, and Mike Johnston suspected the Franklins had stocked the water when some bullheads showed up in the lake. We agree with the district court that the Franklins have proved hostility.[3]

2. *Claim of Right or Color of Title.* The Johnstons also dispute whether the Franklins have proven the Franklins used the Johnstons' side of the lake under a claim of right or color of title. "Color of title is that which in appearance is title but in reality is no title." *Grosvenor v. Olson*, 199 N.W.2d 50, 52 (Iowa 1972).

---

[3] The Johnstons assert the current owners of the Franklin property—Fae's six children—did not expend any money to improve the lake, only their predecessors in title. Thus, the Johnstons claim the Franklins cannot take advantage of the "relaxed standard." *See Brede*, 706 N.W.2d at 828 (noting the relaxing of the traditional requirements for prescriptive easements). However, courts have looked to predecessors in title to determine the agreements and expenditures when determining prescriptive easements. *See Pascal v. Hynes*, 152 N.W. 26, 27 (Iowa 1915) (noting the work done on the drainage ditch was done by the defendant's predecessor in title with the consent of the plaintiff's predecessor in title); *Hatton v. Cale*, 132 N.W. 1101, 1106 (Iowa 1911) (focusing on the work performed and expense incurred by the plaintiff's predecessor in title to create and maintain a drainage ditch on the defendant's property); *Vanneat v. Fleming*, 44 N.W. 906, 908 (Iowa 1890) ("It is shown by the evidence . . . that the ditch referred to in the first count was made upon defendant's land, before he owned it, by the farmer who then owned and cultivated the land. It seems that defendant's grantor, and the plaintiff or his grantor, were in accord in their views as to the ditch, and its course through the two tracts of land, and, either by express agreement or by mutual and silent acquiescence in the manner pursued by each in the improvement, by drains, of their respective lands, agreed upon the construction of the ditch, and the line it should pursue.").

A claim of right is closely related to hostility and can be shown by declarations or actions. *Brede*, 706 N.W.2d at 828. As expressed above, we find hostility has been proven in this case. In addition, it was the Franklins' belief the 1962 easement and agreement gave them the right to use the entire lake. While we do not address whether that document created an express easement, "[a] void deed taken in good faith affords sufficient color of title to sustain the plea and claim of adverse possession by one who, relying thereon has taken and held the possession for the required length of time." *Grosvenor*, 199 N.W.2d at 52. So even if the Franklins and their predecessor in title are mistaken on whether the 1962 agreement gave them the right to use the entire lake, that document is sufficient to prove color of title, especially when considered with the actions taken by the Franklins over the years to maintain that easement. *See* 2 Am. Jur. *Proof of Facts* 3d § 125, at 146 (1st ed. 1988) ("Use based on mistake, such as a mistaken belief of ownership, is sufficient to prove adverse intent."). Upon our review, we agree with the district court that the Franklins have proven a prescriptive easement to use the entire lake.

### D. South Side Boundary Line.

Next, the Johnstons assert the district court erred in failing to establish the "mowed path" south of the lake was the boundary line established by acquiescence. While the district court found a boundary by acquiescence on the north side of the lake that followed the fence line in the ruling on the motion for summary judgment, the court declined to find such a boundary as a matter of law on the south side of the lake. The court stated there were disputed material issues of fact because the Johnstons asserted there were remnants of a fence

located on the southern border, but the Franklins denied that those indistinct markers constituted the boundary line. The court determined, "A fact-finder must determine whether such a line actually exists, and whether the parties knew it existed and agreed to its existence as a boundary line, before 'recognition and acquiescence' can be concluded." The parties disputed the existence of this boundary line at trial, and the court ultimately determined the Johnstons had not proven the boundary line by clear evidence. The court stated,

> There were signs that a fence may have been there at some time. There was some mowing done at some time, but it was never shown by clear evidence that a fence or boundary even existed. No one consented or could even consent to the boundary because, as the Court finds, there was no clear boundary in existence.

The Johnstons assert the silence of the Franklins with respect to the southern boundary should be inferred as acquiescence, especially since the county assessor's cadastral lines prior to 2007 placed the boundary at the mowed path. The Johnstons also claim the court was wrong to focus on a lack of a fence because there is no requirement that a fence exist in order for the boundary to be established.

To establish a boundary by acquiescence, the party asserting the boundary line must show

> mutual recognition by two adjoining landowners for ten years or more that a line, definitely marked by fence or in some manner, is the dividing line between them. Acquiescence exists when both parties acknowledge and treat the line as the boundary. When the acquiescence persists for ten years the line becomes the true boundary even though a survey may show otherwise and even though neither party intended to claim more than called for by his deed.

*Egli v. Troy*, 602 N.W.2d 329, 333 (Iowa 1999) (citation omitted). The standard of proof requires "'clear' evidence." *Id.* While silence or inaction can infer acquiescence, there must still be proof that the silent party knew the other party claimed the line as the boundary line for a period of ten years. *Id.*

In this case, we agree with the district court that the evidence was far from clear that the Franklins or their predecessor in title knew of the existence of a mowed path, knew the mowed path was the claimed boundary line and did nothing, and that those two conditions existed for ten years. The Franklins testified the mowed path occurred much more recently, after the death of Fae in 2012. While the Johnstons submitted into evidence an aerial photograph of the area from 1970 indicating a clearing running south of the lake, there was not clear evidence this clearing and the "mowed path" that Franklins observed after 2012 were in the same location, nor was there evidence the Franklins recognized this clearing and knew the Johnstons or their predecessors in title regarded that area as the property line until this lawsuit was filed. The district court credited the testimony of the Franklins over that of the Johnstons, and we give deference to that determination. *Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996) ("The trier of fact—here, the district court—has the prerogative to determine which evidence is entitled to belief. The district court has a better opportunity than we do to evaluate the credibility of witnesses. So we think factual disputes depending heavily on such credibility are best resolved by the district court." (internal citation omitted)). We affirm the district court's rejection of the Johnstons' claim of a boundary by acquiescence on the south side of the lake.

**E. Frivolous Litigation Sanctions.**

For their final claim on appeal, the Johnstons assert the district court incorrectly denied their request for sanctions against the Franklins under Iowa Rule of Civil Procedure 1.413. The sanctions that the Johnstons seek are related to the Franklins' failed claim that the Johnstons violated the Franklins' civil rights under 42 U.S.C. § 1983 when the Johnstons enlisted the help of the local sheriff to keep the Franklins off the Johnstons' side of the lake.

Rule 1.413 permits the court to sanction a party, including ordering the payment of attorney fees, when "a motion, pleading, or other paper is signed" but the attorney does not have "knowledge, information, and belief, formed after reasonable inquiry," that the pleading or motion "is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law" or when the pleading is "interposed for any improper purpose, such as to harass or cause an unnecessary delay or needless increase in the cost of litigation." The Johnstons assert the Franklins have failed to produce any evidence to support their assertions under section 1983 and, accordingly, the Franklins should pay their attorney fees.

In their motion for summary judgment, the Johnstons asked the court to declare as a matter of law that no section 1983 violation took place. The court rejected the Johnstons' motion on this ground, concluding the Franklins had established "a prima facie section 1983 action." The court noted the parties disputed whether the Franklins had the right to use the entire lake, and because of this disputed issue of material fact, along with the dispute over whether the sheriff and the Johnstons were in a conspiracy to deprive the Franklins of their

property rights, summary judgment was not appropriate. After trial, the district court concluded the sheriff was wrong in determining the Johnstons could keep the Franklins off the Johnstons' side of the lake, but the court went on to reject the Franklins' section 1983 claim because the court found the county sheriff "acted independently and in good faith, following the input of the State Attorney General's office."

Upon our review of the record, we cannot find the court abused its discretion in declining to award attorney fees under rule 1.413. *See Everly v. Knoxville Cmty. Sch. Dist.*, 774 N.W.2d 488, 492 (Iowa 2009) (noting we employ the abuse of discretion standard when reviewing the court's decision on whether to impose sanctions under rule 1.413). As noted by the court in the summary judgment motion, the Franklins established a prima facie case to support their section 1983 action; therefore, the section 1983 action was "well grounded in fact and . . . warranted by existing law." While the Franklins ultimately did not prevail on the claim, this does not mean that making such claim was in violation of rule 1.413.

We affirm the district court's decision on the Johnstons' appeal and turn our attention to the Franklins' cross-appeal.

## IV. The Franklins' Cross-Appeal.

For their cross-appeal, the Franklins raise two additional issues. They assert the district court erred in determining the Johnstons have a legal right to drain the lake and assert the district court's decision lacks the specificity needed to establish an easement for Mike Johnstons' dock, which is on their property by

virtue of the district court's denial of the Johnstons' claim to establish a boundary by acquiescence through and to the south of the lake.

## A. Right to Drain the Lake.

The district court noted in its order following the trial that, while very little testimony or legal precedent was presented on the issue of whether the lake can be drained, the 1962 easement and agreement did not require the Estles to build a dam or make a lake, it only permitted such construction, and therefore, the document does not require the lake to exist in perpetuity.

The widely accepted rule is "the owner of a dam is not obliged to maintain it for the benefit of other riparian owners who benefit from the formation of an artificial pond by the erection of the dam." *Hood v. Slefkin*, 143 A.2d 683, 687 (R.I. 1958).

> [T]he rule supported by most courts is that the mere fact that one has used or improved his or her property with reference to the artificial condition created by the maintenance of a dam by another, so that the person would suffer loss or inconvenience by the removal or alteration of such dam, confers upon that person no right to the continued maintenance thereof for his or her benefit or, at least, imposes upon the proprietor of the dam no affirmative obligation with respect to such maintenance. In the absence of any covenant to keep a lake at a certain level by the maintenance of a dam, the owner of the dam may abandon and destroy it.

78 Am. Jur. 2d *Waters* § 270 (2013) (footnote omitted).

In *Kiwanis Club Foundation, Inc. v. Yost*, the Nebraska Supreme Court held

> that where a dam has been built for the private convenience and advantage of the owner, he is not required to maintain and operate it for the benefit of an upper riparian proprietor who obtains advantages from its existence; and that the construction and maintenance of such a dam does not create any reciprocal rights in

upstream riparian proprietors based on prescription, dedication, or estoppel.

139 N.W.2d 359, 361 (Neb. 1966); *see also* 1972 Op. Iowa Att'y Gen. 72-4-5 (citing with approval the *Yost* case in rendering an opinion on the rights of downstream landowners to require the continued maintenance of an upstream dam).

The Franklins assert the language in the agreement that grants the Johnstons the "perpetual right to erect and maintain such dam" imposes on them the responsibility to maintain it once the dam is erected. The Franklins assert the erection of the dam and subsequent creation of the lake gave them valuable property rights that the Johnstons should not be allowed to unilaterally destroy. Again, we will not interpret the agreement so broadly. The agreement only gives the Johnstons the right to maintain the dam in perpetuity but does not impose on them the obligation to maintain the dam once constructed. There is a difference between a legal right and an obligation. *Compare Right*, Black's Law Dictionary (10th ed. 2014) ("A power, privilege, or immunity secured to a person by law."), *with Obligation*, Black's Law Dictionary (10th ed. 2014) ("A legal or moral duty to do or not do something."). As the *Yost* court concluded:

> Construction and maintenance of a dam over a long period of years may well tend to lead persons owning property above the dam to believe that a permanent and valuable right has been acquired, or is naturally present. The very fact that a manmade dam is obviously present, however, is sufficient to charge them with notice that the water level above the dam is artificial as distinguished from natural, and that its level may be lowered or returned to the natural state at any time.

139 N.W.2d at 361. We agree with the district court there is no requirement the Johnstons must maintain the dam in perpetuity.

## B. Specifications of the Dock.

Finally, the Franklins assert more specificity and direction is needed to describe the easement now created with respect to the shoreline and dock existing and serving the Mike Johnston property that is located on the Franklins' property. The court declared a boundary by acquiescence north side of the lake along the existing fence line, but from the final fence post on the north side of the lake, which is still north of the shoreline and the dock,[4] there is now a right angle to the deeded property line. The right angle imposed by the court from this southernmost fence post to the deeded property line results in part of the shoreline and the dock near Mike Johnston's house to be on the Franklins' property. In its posttrial motion, the Franklins requested the district court enlarge its decision to

> limit the dock's size and location to that which presently exists,
> however, allowing for repairs, but not expansion of or changes in
> the height of the dock from the land below the water surface, nor
> any other change in location on the Plaintiffs' land; and provide that
> if the dock is removed, it may not be replaced, or alternatively
> define the replacement limitations.

The district court summarily denied this claim along with the other posttrial motions filed by the parties.

On appeal the Franklins request this court to provide specific dimensions and terms of use to avoid future litigation over Mike Johnston's use of this shoreline and dock. The Johnstons also assert the boundary created by the court is "disjointed, unworkable, [and] impracticable." The Johnstons contend

---

[4] Counsel for the Franklins described at oral argument that the southernmost fence post was approximate three to five feet north of the shoreline.

there was no evidence the Franklins ever used this piece of the shoreline or Mike Johnston's dock or that they ever disputed the location of the deed line in that area from when the fence line was built in 1971 until 2007.

There is a dearth of evidence in the record about the size, location, condition, and history of the shoreline and dock that exists near Mike Johnston's property on the north side of the lake. However, this is understandable because it was the district court's decision, ending the boundary by acquiescence at the southernmost fence post and then running the property line due east until it intersects with the deed line, that created the parties current dispute over the use of this shoreline and dock. In order to prevent further future litigation over this shoreline and dock, we remand this case to the district court so that it may expand its ruling as to the boundary line north of the lake so that the shoreline and dock near Mike Johnston's house remain part of Mike Johnston's property. The parties may offer evidence and legal argument to the district court as to the proper designation of this piece of property. However the parties and the district court resolve the language, the size and location of the dock should never impede the prescriptive easement of the Franklins to access and enjoy the Johnstons' side of the lake as described above.

**V. Conclusion.**

With the death of the Franklin family matriarch, so died the respectful, courteous, and reciprocal use of the fourteen-acre lake in question. We echo the district court's sediments that all of this litigation may well have been resolved in an amicable way had Fae lived. As there appears to be no way for the parties to resolve this case in a peaceable way, we must now rule on the multitude of

issues raised on appeal. We conclude the use restrictions in the 1962 easement and agreement have expired and are no longer enforceable because more than twenty-one years has passed since the parties entered into the agreement and it is undisputed no party filed a verified claim within that time period pursuant to Iowa Code section 614.24. We agree with the district court's determination that the right of first refusal violates the rule against restraints on the alienation of land and is therefore unenforceable. We also agree with the district court's conclusion that the Franklins have proven a prescriptive easement to use the entire lake. We affirm the district court's rejection of the Johnstons' claim of a boundary by acquiescence through and on the south side of the lake due to the lack of clear evidence to support the claim, and we also conclude the district court did not abuse its discretion in declining to award attorney fees under rule 1.413.

With respect to the Franklins' cross-appeal, we agree with the district court there is no requirement the Johnstons must maintain the dam in perpetuity. However, we remand this matter to the district court so that it may expand its decision with respect to the shoreline and dock near Mike Johnston's property. On remand the parties may offer to the district court evidence and legal argument to support their claim for the proper designation of this property. However, Mike Johnston's use of this dock should never impede the Franklins' prescriptive easement to use the entire lake. We do not retain jurisdiction.

**AFFIRMED IN PART, MODIFIED IN PART, AND REMANDED.**

Vaitheswaran, J., concurs; Danilson, C.J., concurs specially.

**DANILSON, Chief Judge.** (concurring specially)

I specially concur because I agree in all respects and with the result except I would conclude that even if the legislature intended retroactive effect of the 2014 amendment to Iowa Code section 614.24, the retroactive application could not restore or resurrect a use restriction that was otherwise stale and had long ago expired. To do so would recreate or reincarnate a property-use restriction that had fully expired causing chaos in real estate titles and past title searches. Here, the use restriction was stale and had expired decades before the amendment. Accordingly, the majority has unnecessarily attempted to interpret section 614.24(5)(c) to support its analysis, an interpretation with which I disagree.